**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Guy Rufus HUDDLESTON,
Defendant-Appellant.**

No. 85–1938.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 8, 1986.

Decided Oct. 8, 1986.

Don Ferris, argued, Ann Arbor, Mich., for defendant-appellant.

Phyllis M. Golden, argued, Detroit, Mich., for plaintiff-appellee.

Before KEITH and NELSON, Circuit Judges and CONTIE, Senior Circuit Judge.

KEITH, Circuit Judge.

Appellant, Guy Rufus Huddleston, was convicted after a jury trial on one count of a two count indictment.[1] He was convicted pursuant to 18 U.S.C. § 659 arising out of his possession of 500 stolen video tapes.[2] Because the district court abused its discretion in admitting evidence under Fed.R. Evid. 403, we reverse.

## I.

In early April 1985, Memorex brand T-120 VHS blank cassette tapes were manufactured at the Tandy-Bell & Howell plant in Northbrook, Illinois. After these tapes were made, they were sent to Memtech Products in Arlington Heights, Illinois.[3] Memtech sold the tapes to the Michigan K-Mart Corporation for $4.69 per tape. Memtech shipped 32,448 blank VHS tapes to K-Mart via an Overnight Express semi-trailer truck. The trailer was first sent to the Overnight Express yard in South Holland, Illinois, because K-Mart was not scheduled to take delivery until April 16, 1985. On April 15, Overnight Express employees discovered the trailer was missing.

On April 17, 1985, appellant informed Karen Curry, the manager of the Magic Rent-to-Own in Ypsilanti, Michigan that he had a truckload of blank VHS tapes which he sought her assistance in selling.[4] Ms. Curry asked appellant if the tapes were stolen, and he assured her they were not. Appellant told Ms. Curry that he purchased the tapes directly from the manufacturer in Chicago for one dollar per tape. He also told her that he had a bill of sale, and that he wanted her to sell them in no less than 500 tape lots at $2.75 to $3.00 per tape. Before she arranged the sale of any tapes for appellant, Ms. Curry checked with the Ypsilanti Police Department to determine if the tapes were stolen. Thereafter, Ms. Curry called area retailers. She informed them that the tapes would be sold in lots of no less than 500, and that no personal or business checks would be accepted. Consequently, Ms. Curry arranged sales of 4,000 tapes to Curtis Mathes Home Entertainment Center, 500 tapes to New York Video World and 500 tapes to Movieland. Ms. Curry also arranged a sale to Nowshowing Video. Appellant sold Nowshowing Video 500 tapes for $1,500: he also signed a receipt.

Ms. Curry testified that appellant used his own name in every transaction, and instructed her that he would take care of problems with defective tapes; therefore, she told customers that defective tapes could be returned to Magic Rent-to-Own. Appellant paid Ms. Curry twenty-five cents a tape for arranging the first two sales. Thereafter, the FBI contacted Ms. Curry and told her the tapes were stolen. Ms. Curry was instructed not to tell appellant that she knew the tapes were stolen. Conversely, appellant never indicated in any way to Ms. Curry that he knew the tapes were stolen.

At the outset of the trial, the government made a motion *in limine* to introduce evidence of similar acts, pursuant to Fed.R. Crim.P. 404(b). The government stated that it intended to present evidence showing that appellant was involved in the sales of television sets prior to the sale of the VHS tapes, that he talked about selling VHS tapes, and that he attempted to sell refrigerators to an FBI under cover agent five days after the sale. Evidence was admitted that approximately one month before the dates charged in the indictment, appellant sold about forty black and white television sets to Paul Toney, a record

---

1. Appellant was acquitted of selling 4,000 stolen blank VHS tapes which is an offense under 18 U.S.C. § 2315.

2. The tapes were in appellant's possession between April 23 and April 25, 1985.

3. Memtech which is the sales branch of Tandy, purchased the tapes for $4.53 each.

4. Ms. Curry testified that appellant was a friend of Alphonse Lewis, the owner of the Magic Rent-to-Own discount appliance and rental store. Apparently, appellant was a local housing contractor who came by Magic Rent-to-Own once a week to use the store as his office. Ms. Curry took messages and occasionally helped appellant with typing.

store owner, at a cost of $28.00 each. No evidence was presented at trial showing that the televisions were stolen.[5] During these transactions appellant told Mr. Toney that he had purchased a truckload of blank video cassette tapes which he would also sell to Toney for $2.75 a tape. On May 1, 1985 appellant offered to sell 10,000 VHS movie tapes to undercover FBI Agent Robert Nelson at a cost of $1.57 each. Appellant told Agent Nelson that he purchased the tapes in Chicago. Appellant also offered to sell Zenith color television sets at $200.00 each. Agent Nelson asked appellant whether these items were stolen. Agent Nelson testified that appellant stated that either "some are hot and some are not" or, most of the tapes "were not hot." Appellant testified that he told Agent Nelson all of the items "were not hot."

Agent Nelson also testified that appellant offered to sell Amana refrigerators, ranges and icemakers. The Amana appliances were part of an interstate shipment which was recently reported stolen. Upon delivery of the refrigerators to Agent Nelson, appellant and a Mr. Leroy Wesby were arrested.

## II.

On appeal, appellant raises several assignments of error.[6] However, we will not address each assignment. Rather, our focus will center on whether the trial court abused its discretion in permitting the government to present evidence of appellant's *prior* misconduct. Specifically, whether it was an abuse of the trial court's discretion to admit evidence pertaining to appellant's sale of black and white televisions.[7]

Generally, under Fed.R.Evid. 404(b) evidence of a criminal defendant's prior misconduct is inadmissible during the prosecution's case in chief for the purpose of showing the accused's bad character or criminal propensity. *United States v. Ailstock,* 546 F.2d 1285, 1289 (6th Cir.1976). However, evidence of a defendant's prior misconduct may be admitted to show motive, intent, absence of mistake, opportunity, preparation or knowledge. *United States v. Schaffner,* 771 F.2d 149 (6th Cir. 1985); Fed.R.Evid. 404(b). Our review of the admission of evidence challenged under Fed.R.Evid. 404(b) requires this Court to next make two determinations: whether the evidence admitted is relevant and whether the probative value of the evidence outweighs its potential for prejudice. *United States v. Dabish,* 708 F.2d 240, 242 (6th Cir.1983); Fed.R.Evid. 403. It is clear the contested evidence was relevant. What is at issue is whether its probative effect was outweighed by its prejudicial value. The trial court's balancing of probativeness and prejudice is reviewed under an abuse of discretion standard. *Id.*

In reviewing the evidence of the sale of the black and white televisions, we note the government never proved that they were stolen. Although the government implied that the televisions were stolen and that appellant and Mr. Lewis were lying about the legitimacy of the sale, no evidence was presented by the government concerning the origin of the televisions. The appellant's defense at trial was that he did not know the tapes he possessed were stolen; thus the government should not have been allowed to present "misconduct" evidence

---

5. The government's only support for the assertion that the televisions were stolen was the appellant's failure to produce a bill of sale at trial and the fact that the televisions were sold at a low price.

6. Appellant argues: (1) the trial court committed reversible error by refusing to instruct the jury that character evidence may create a reasonable doubt of guilt; (2) the impeachment of Alphonse Lewis with a 13 year old misdemeanor conviction was improper, affected appellant's substantial rights and denied him a fair trial;

(3) the trial court abused its discretion in allowing the government to present evidence of appellant's prior and subsequent misconduct; and (4) appellant's motion to dismiss Count 1 for lack of venue should have been granted.

7. The district court found that this evidence was relevant to the question of whether appellant knew that the VHS tapes were stolen, and that the probative value of such evidence outweighed its prejudicial effect to the appellant.

when it could not show that there was any misconduct with regard to the televisions. Consequently, since the prejudicial value of the admission of the sale of the televisions outweighed the probative value, we hold that the trial court abused its discretion.

■ Requirements for the admission of other crimes, wrongs or acts evidence under Rule 404(b) are well established in other circuits. One of the prerequisites for admission of other crimes evidence is clear and convincing proof of the similar offense. *United States v. Two Eagle*, 633 F.2d 93, 96 (8th Cir.1980); *United States v. Robbins*, 613 F.2d 688 (8th Cir.1979); *United States v. Bailleaux*, 685 F.2d 1105 (9th Cir.1982); *United States v. Silva*, 580 F.2d 144 (5th Cir.1978); *United States v. Myers*, 550 F.2d 1036 (5th Cir.1977), *cert. denied*, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978). Adopting the clear and convincing proof standard in this circuit, we hold that the government failed to meet that standard. Specifically, the government's attorney admitted at oral argument before this Court that no clear and convincing proof was presented to the trial court that the televisions were stolen or that appellant knew that they were stolen. Consequently, it was impermissible for the jury to receive evidence that they could infer the televisions were stolen absent clear and convincing proof.

The government contends that the admission of the similar acts evidence was harmless error. We disagree. The introduction of such evidence in the government's case in chief was not harmless beyond a reasonable doubt. *See Chapman v. State of California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

In *United States v. Manafzadeh*, 592 F.2d 81 (2d Cir.1979) the court ruled that other crimes evidence was admitted improperly since it afforded the jury the opportunity to draw the impermissible inference that because the defendant had apparently acted unlawfully on another occasion, he must have committed the unlawful acts charged in the case.[8] Here, the impermissible inference went a step further. The government made a motion, prior to trial, to introduce prior similar acts evidence which the district court admitted because it was relevant. The similar act evidence, (television transaction) was a major point of contention throughout the trial since appellant maintained he did not know the televisions were stolen. Furthermore, the admission of the prior acts evidence was accentuated because appellant's defense at trial was that he did not know the tapes he possessed were stolen.[9] Since admission of the prior act evidence was potentially very prejudicial, we cannot hold that it was not harmless beyond a reasonable doubt.

■ The government also argues that during the trial appellant never objected to the prior acts evidence nor did he move to strike it; therefore, the government contends Fed.R.Crim.P. 52(b) provides that plain errors or defects affecting substantial rights may be considered although they were not brought to the trial court's attention. The plain error doctrine permits reversal despite lack of objection if there has been miscarriage of justice. *Wilson v. Attaway*, 757 F.2d 1227 (11th Cir.1985); *Higgins v. Hicks Co.*, 756 F.2d 681 (8th Cir. 1985). Here, it has already been established that the admission of the prior acts evidence was not harmless beyond a reasonable doubt. Furthermore, it is clear that the admission of prior acts evidence affected the "substantial rights" of appellant: especially since his defense at trial was that he did not know the tapes were stolen. Since it was plain error to admit evidence of the sale of the televisions without clear and convincing proof that they

---

8. *Contra United States v. Chaimson*, 760 F.2d 798 (7th Cir.1985) (holding that in cases where government must prove specific intent as an element of crime charged, evidence of other acts may be introduced to establish that intent).

9. The government attempted to have the jury infer the television sets were stolen and from that inference in turn infer that since the appellant had sold "stolen" television sets earlier, he must have possessed and sold the stolen tapes here.

had been stolen, we find there was a miscarriage of justice. Thus, this issue was preserved for appeal.

In light of the fact that the admission of the prior acts evidence was not harmless beyond a reasonable doubt, that the evidence that the television sets were stolen was not clear and convincing and that this evidence was more prejudicial than probative, we find that the admission was an abuse of discretion.

Accordingly, the district court's verdict is reversed and remanded.

DAVID A. NELSON, Circuit Judge, dissenting.

I agree with the court that the evidence of appellant's contemporaneous dealings in $28.00 television sets of dubious pedigree was clearly relevant. Appellant having obtained these suspiciously inexpensive new television sets from the same truckdriver who supplied him—at about the same time and in about the same manner—with Memorex videotapes from a stolen semitrailer, it seems to me equally clear that the introduction of the evidence was not unfairly prejudicial. "No strictly mechanical test provided by the appellate courts will help the trial judge much in sensitively drawing a fair balance," 2 Weinstein & Berger, *Weinstein's Evidence*, ¶ 404[10], at 404–73 (1985), but looking at the entire record in retrospect, I do not think the trial court's determination was an abuse of discretion. If the trial court did abuse its discretion in admitting evidence of the entire course of dealings between appellant and his supplier, moreover, I believe that the error was harmless. Accordingly, I am constrained to dissent.

The supplier in question was introduced to appellant in December of 1984 as a truckdriver named Leroy Wesby. Mr. Wesby told appellant that he had 770 television sets for sale, and he asked if appellant knew anyone who might be interested in buying them. Appellant introduced the truckdriver to the owner of the "Magic Rent-To-Own" equipment rental business, Mr. Alphonse Lewis, who bought 500 of the sets and paid appellant a finder's fee. Appellant testified that he and Mr. Lewis interviewed the truckdriver "for approximately five hours" to satisfy themselves that the goods had not been stolen; in all that time, however, they never asked him where he had acquired the property. Unlike Mr. Lewis, moreover, appellant never claimed that the truckdriver ever showed him a receipt or bill of sale for the television sets—or for the stolen Memorex tapes, or for any of the other merchandise he offered appellant from time to time. (Mr. Lewis testified that the truckdriver "did present to me a so-called bill of lading" for the television sets, but this so-called bill of lading was not introduced in evidence; Mr. Lewis claimed he was unable to find it at the time of trial.)

When the truckdriver sought appellant's assistance in selling the stolen Memorex videotapes, appellant's response, as described on cross-examination, fit the pattern that had been followed in the case of the television sets. Appellant asked if the tapes had been stolen, but (contrary to his testimony on direct examination) he did not inquire where they had come from, and he did not claim to have asked to see a receipt or bill of sale:

"Q. When Mr. Wesby called you and told you he had some tapes, did you ask him where he got them?

A. Not that I can remember.

Q. At that point, you weren't concerned about the tapes being stolen?

A. At that—I did ask him if the material was stolen and we always talked about if the material is stolen.

Q. But you never asked where he got them from?

A. No.

Q. Did you ever ask to see a receipt or a bill of sale?

A. I always ask if the stuff was safe and if I could proceed in a business-like manner in selling the materials."

After Mr. Lewis had taken possession of the 500 television sets, appellant arranged for the resale of 38 of them, at $28.00 each (a sum out of which Mr. Lewis presumably made a profit and appellant received a fee). The customer expressed an interest in buying more at that price. In order to be able to buy more television sets, as the customer testified, appellant told him that he would also have to take blank videocassette tapes, of which "they had just purchased a truckload...." The evidence thus showed not only that appellant had a common source for the television sets and the tapes, and that appellant was more interested in knowing that both products were "safe" than in knowing where they came from, but the evidence also showed that appellant tried to tie the tapes to the television sets in disposing of them. If the jury had been kept in the dark about the television sets, therefore, it could not have been given the full story on appellant's sales efforts with respect to the tapes.

The story of how appellant sold the tapes is not uninstructive. Appellant was a construction contractor by trade, not a merchant. He had no established retail or wholesale business. When the Memorex tapes turned up, he went to the Magic Rent-To-Own store owned by his friend Mr. Lewis and prevailed upon the manager of the store, Karen Curry, to offer the tapes for sale in the store's name. The manager was highly suspicious:

> "... 'Guy,' I said, 'Are they stolen?' and he said 'No, they're not stolen.'
>
> I said, 'Are you sure they're not stolen? Look me in the eye and tell me they're not stolen.'
>
> And he looked me in the eye and said, 'Karen, the tapes aren't hot. They're not stolen.'"

The manager—who, unbeknownst to appellant, called the police about the tapes every day thereafter until a stolen property report finally surfaced—also testified that appellant told her he had got the tapes "directly from the manufacturer." Appellant denied having said this, but offered no explanation of why the store manager (who was not a suspect) would have perjured herself.

The evidence is undisputed that the tapes were stolen, that appellant had not got them from the manufacturer, and that they were sold at a bargain price. The cost of manufacture alone came to more than $4.50 per tape, yet the evidence showed that on at least one sale from which appellant received part of the proceeds, the truckdriver-supplier, Mr. Wesby, cleared only about $2.00 per tape—less than half the cost of manufacture and about one third the usual wholesale price. Appellant may have believed the tapes were "safe," as he testified, but the jury was entitled to be as skeptical as the store manager seems to have been about his claim that he did not know they had been stolen. That skepticism can only have been strengthened by the testimony of the FBI undercover agent to whom appellant was trying to sell refrigerators, television sets and movie tapes obtained from Mr. Wesby; although appellant denied, on the stand, that he had done so, the agent testified that appellant had told him at least some of these goods were "hot," and this was confirmed by the transcript of a surreptitious tape recording of the conversation. Taken as a whole, the evidence strongly indicated, as the government suggested in final argument, that appellant was engaged in a "pattern of illegal activity" of which the stolen tapes and the television sets, both obtained from a common source, constituted integral parts.

The evidence relating to the television sets was no more prejudicial than that relating to any of the other merchandise supplied by the truckdriver, Mr. Wesby, and it may well have been less so, given the participation of Mr. Lewis (who is an attorney) in the "five-hour" interrogation of Mr. Wesby about the TV sets. In any event, the trial judge's charge to the jury minimized any risk of prejudice:

> "You have heard evidence of the defendant's possession of goods other than the tapes involved in this case.

The defendant is not on trial for activities pertaining to any goods other than the tapes.

This evidence is admitted only as it may bear on defendant's intent, plan, knowledge, or absence of mistake or accident in this case.

It is not to be used by you to prove the character of the person to show that he acted in conformity with that character."

I am by no means convinced that evidence as to the television sets would not have been admissible as part of the *res gestae* regardless of appellant's state of mind, but if a showing that appellant knew the television sets were stolen was required, I cannot agree with the court that such showing had to be "clear and convincing." The trial court charged the jury that it was the government's burden to prove, beyond a reasonable doubt, that appellant knew the *tapes* were stolen, but I do not think it follows that the government had to prove, with equal certitude, that appellant knew the *television sets* had also been stolen. See *United States v. Leonard*, 524 F.2d 1076 (2d Cir.1975), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976), where the Court of Appeals for the Second Circuit held, in an opinion written by Judge Friendly, that if "the aggregate of the evidence" is sufficient to permit a finding, beyond reasonable doubt, of criminal intent as to the crime charged, a "preponderance [of the evidence] standard is sufficient" for the subsidiary facts offered to establish such intent. 524 F.2d at 1091. The contrary view set forth in cases such as *United States v. Broadway*, 477 F.2d 991, 995 (5th Cir.1973), said Judge Friendly, "appears to rest on a misconception." 524 F.2d at 1090.[1] This court itself has recently endorsed Judge Friendly's view, citing *Leonard* in support of the proposition that "[c]ourts may admit evidence of prior bad acts if the proof shows *by a preponder-*

*ance of the evidence* that the plaintiff did in fact commit the act." *United States v. Ebens*, 800 F.2d 1422, 1432 (6th Cir.1986) (emphasis supplied).

In a carefully reasoned opinion handed down by the Court of Appeals for the Fifth Circuit, sitting *en banc* soon after the Federal Rules of Evidence became effective, that court also adopted Judge Friendly's view and, overruling *United States v. Broadway*, 477 F.2d 991, *supra*, rejected the doctrine that evidence of similar wrong acts is admissible only if proof of their wrongness is "clear and convincing." Noting that the Federal Rules of Evidence "place greater emphasis on admissibility of extrinsic offense evidence" than the Supreme Court, acting in its rule-making role, had done earlier, the court held that:

"The [trial] judge need not be convinced beyond a reasonable doubt that the defendant committed the extrinsic offense, nor need he require the Government to come forward with clear and convincing proof. [Footnote omitted.] The standard for the admissibility of extrinsic offense evidence is that of Rule 104(b): 'The preliminary fact can be decided by the judge against the proponent only where the jury could not reasonably find the preliminary fact to exist.' 21 Wright & Graham, *Federal Practice and Procedure: Evidence* § 5054, at 269 (1977)." *United States v. Beechum*, 582 F.2d 898, 910 n. 13 & 913 (5th Cir.1978).

The logic of the Fifth Circuit's *en banc* decision in *Beechum* corresponds to that applied by Judge Learned Hand in *United States v. Brand*, 79 F.2d 605 (2d Cir.1935), *cert. denied*, 296 U.S. 655, 56 S.Ct. 381, 80 L.Ed.2d 466 (1936). In *Brand*, which affirmed a conviction for transporting a stolen automobile, the court flatly rejected the doctrine "that evidence of the receipt of other stolen goods is not admissible unless

---

1. Quoting other Second Circuit precedent to the effect that the trial court's determination on the prejudicial effect of "similar act" evidence "will rarely be reversed on appeal," Judge Friendly also stated that "the weighing of the probative value of the evidence against its potentially prejudicial effect is primarily for the trial judge who has a feel for the effect of the introduction of

this type of evidence that an appellate court, working from a written record, simply cannot obtain." 524 F.2d at 1092. In our circuit, similarly, "[i]t is well settled that a trial judge's discretion in balancing the probative value of evidence against its potential for unfair prejudice is very broad." *United States v. Dabish*, 708 F.2d 240, 243 (6th Cir.1983).

the prosecution proves that the accused knew them to have been stolen." *Id.* at 606. The competence of evidence of other similar acts "does not depend upon conformity with *any* fixed conditions, such as upon direct proof of scienter," Judge Hand wrote: "[t]he [trial] judge must decide each time whether the other instance or instances form a basis for sound inference as to the guilty knowledge of the accused *in the transaction under inquiry;* that is all that can be said about the matter." *Id.* (emphasis supplied). In a passage highly pertinent to our case, where the evidence showed that the television sets, Memorex videotapes, refrigerators and movie tapes in which appellant was dealing all came from the same truckdriver-supplier, Judge Hand went on to say that "[i]f, for example, the subject of the indictment were the last of a series of purchases *from the same thief,* the earlier purchases would be competent, for thieves are unlikely to risk repeated transactions with innocent buyers." *Id.* (emphasis supplied).

I would follow these well-reasoned decisions in preference to the contrary view adopted, initially, in some other circuits before the Federal Rules of Evidence came into existence. The contrary view seems to have been based on concerns now dealt with—adequately, in my judgment—in Rule 403 of the Federal Rules of Evidence.

Finally, if the trial court did err in this case by letting the jury know about the television sets, I am convinced that the error was harmless. It should be emphasized in this connection that appellant does not contend, and the record does not suggest, that the trial court's allegedly erroneous evidentiary ruling presents any *constitutional* question. *Chapman v. State of California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), dealt only with error of constitutional dimension, and it is only constitutional errors that cannot be deemed harmless unless harmless "beyond a reasonable doubt." 3A C. Wright, *Federal Practice and Procedure: Criminal 2d* § 855, at 335 (1982); *Connecticut v. Johnson,* 460 U.S. 73, 88, n. 2, 103 S.Ct. 969, 978, n. 2, 74 L.Ed.2d 823 (1983) (Stevens, J., concurring in the judgment).

"The test announced in *Chapman* for determining when a constitutional error is harmless is more exacting than the test for harmlessness of errors that are not of constitutional dimension. The courts have not yet followed the lead of some commentators who argue that a single test should apply to both constitutional and non-constitutional error." C. Wright, *supra,* § 855, at 335.

After a careful reading of the entire record, I am not persuaded that the facts of this case should prompt us to hold—as no other Federal Court of Appeals seems to have done—that non-constitutional error must be found harmless "beyond a reasonable doubt" before a conviction may be affirmed.

I believe one can say here, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). Only this is required for affirmance of the conviction. *Id.* The conduct of the trial judge in this case was impeccable, the jury obviously bent over backward to be fair, and I see no reason for this court to require that appellant be retried.