UNITED STATES of America, Appellee,

v.

Robert Christopher INGRAHAM a/k/a
Arthur Robert MacKeil,
Defendant, Appellant.

No. 86–1993.

United States Court of Appeals,
First Circuit.

Argued July 28, 1987.

Decided Oct. 29, 1987.

A. Clayton Spencer with whom Janis M. Berry, by Appointment of the Court, and Ropes & Gray, Boston, Mass., were on brief for appellant.

Margaret D. McGaughey, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty., Portland, Me., and James L. McCarthy, Asst. U.S. Atty., were on brief for appellee.

Before CAMPBELL, Chief Judge, NOONAN[*] and SELYA, Circuit Judges.

SELYA, Circuit Judge.

It has been written that, "when Fortune means to men most good, she looks upon them with a threat'ning eye." W. Shakespeare, *King John*, Act III (1597). Whether or not the casting of black glances comprises an auspicious augury, giving voice to the menace may catalyze 18 U.S.C. § 875(c), a federal criminal statute which makes it a crime to transmit "in interstate commerce any communication containing any threat to kidnap any person or any threat to injure the person of another." And therein lies the rub.

## I. BACKGROUND

Defendant-appellant Robert Christopher Ingraham was convicted by a jury in the United States District Court for the District of Maine for transgressing the mandate of § 875(c). Ingraham asks us to overturn the judgment. Inasmuch as his appeal challenges the sufficiency of the government's proof, we present the facts in the light most favorable to the prosecution, drawing all reasonable inferences supportive of the government's position. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Cintolo*, 818 F.2d 980, 983 (1st Cir.1987); *United States v. Patterson*, 644 F.2d 890, 893 (1st Cir.1981).

On October 30, 1985, Glenn Adams, a reporter in the Augusta, Maine office of the Associated Press (A.P.), answered the telephone. The anonymous caller, who we will refer to for the time being as "X", identified himself as representing the American Revolutionary Democratic Front (Front), an organization of which nothing was known. Adams described the voice as being that of a youthful male bereft of any discernible accent. X proceeded to threaten the lives of a prominent foursome: Governor Joseph Brennan; James Tierney, Maine's attorney general; United States Senator George Mitchell; United States District Judge Gene Carter. The disembodied voice indicated that these officials would be killed unless Governor Brennan ordered the arrest of some of the defendants in what was described as an "an on-again, off-again" lawsuit brought by "a person by the name of Ingraham." The reporter was told that the suit stemmed from the harassment of "a person named MacKeil or MacTeil" by a Penobscot County plenipotentiary, and that money was needed to continue it. X stated that he had made similar calls to newspapers such as the Boston Globe and the New York Times, and to a major television network. Although X refused to divulge his identity, he

[*] Of the Ninth Circuit, sitting by designation.

did reveal that he was calling from New York.

An investigation ensued. Ingraham, born Arthur Robert MacKeil, was subsequently indicted and charged with making the threatening call. Ingraham was a young man who spoke with no particular inflection. Since 1979, he had carried on a running dispute with the University of Maine, prescinding in part from measures taken by the school following appellant's repeated trespasses at the Orono campus. Believing that the university had violated his civil rights, Ingraham filed a series of suits against university officials in both state and federal courts. While this legal donnybrook was in full swing, appellant sent some thirty letters to public officials. Virtually all of them made reference to the suits which Ingraham had initiated. Many—but not all—contained threats of violence, overt or veiled. At least one, sent to Tierney, specifically threatened Brennan, Mitchell, and Carter. The missives were posted on various dates between 1980 and 1985, and a number of them demanded payment of huge sums of money in settlement of Ingraham's litigation.

At trial on the instant indictment, Ingraham's letters were admitted as evidence, as was testimony concerning two anonymous telephone calls made on October 1, 1985 to news outlets in Boston, Massachusetts: one to a journalist at the A.P. office there, and the other to an anchorman at Channel 5, the Boston affiliate of a major television network. The government also introduced statements made by Ingraham at his bail hearing. While the defendant stipulated that he had authored the letters, he offered no comparable stipulation as to the October 1 calls. On the basis of this and other evidence, the jury returned a guilty verdict.

Ingraham's counsel have spared no effort in their vigorous attack upon this verdict. The principal challenge is to the evidentiary rulings made below. Appellant theorizes that certain evidence—the letters, the early October calls, and the bail hearing statements—should have been excluded by the district court. As the defense sees things, once this improper material is dropped by the wayside, the evidence which remains is insufficient to support a finding of guilt. We disagree both with the exclusionary premise and with the exculpatory conclusion.

## II. THE PRECURSORY COMMUNICATIONS

■ Under Fed.R.Evid. 404(b),[1] extrinsic offense evidence, though inadmissible to show an individual's (evil) proclivities, may properly be used at trial if it has some special relevance in establishing a disputed material issue (such as "identity" in this case), provided that its probative value is not overbalanced by the danger of unfair prejudice to the defendant. *United States v. Lau*, 828 F.2d 871, 874 (1st Cir.1987); *United States v. Gonzalez-Sanchez*, 825 F.2d 572, 579 (1st Cir.1987). The latter segment of the test is to be conducted in light of the considerations undergirding Fed.R.Evid. 403,[2] and is committed to the trial court's sound discretion.

Other acts may have special relevance anent an issue like identity, for instance, if they are methodologically so reminiscent of the charged crime as to earmark them as the defendant's handiwork. *United States v. Pisari*, 636 F.2d 855, 858 (1st Cir.1981). Because of the emphasis on special (identifying) characteristics and distinctive touches, we have said that, for a practice to be attributable to the accused, it must contain what amounts to his "signature." *Id.*

1. Fed.R.Evid. 404(b) reads as follows:
   Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

2. Fed.R.Evid. 403 reads as follows:
   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

But the required signature need be but a fair congener, not a facsimile or exact replica. *See United States v. Scelzo*, 810 F.2d 2, 5 (1st Cir.1987) (requirement is that the evidence "must have a similarity sufficient to be probative"); *United States v. O'Brien*, 618 F.2d 1234, 1238 (7th Cir.1980) ("similar [wrongful] acts need not be duplicates"). In the last analysis, the court must make a reasoned determination as to "whether the characteristics relied upon are sufficiently idiosyncratic to permit an inference of pattern for purposes of proof." *Pisari*, 636 F.2d at 859 (quoting 3 Weinstein's Evidence at 404–92 to –94 (1978)).

The appellant, it will be recalled, stipulated that he had authored the thirty letters. He nevertheless contests the propriety of their introduction into evidence, branding them as so far afield as to fall beyond the reach of Fed.R.Evid. 404(b). He contends, as well, that mention of the two anonymous telephone calls made on October 1, 1985 was improperly allowed at trial. Ingraham denies that any of these pieces of evidence have "special relevance" within the ambit of Rule 404(b). And, he makes a fallback argument; if and to the extent the first prong of the rule has been satisfied, his imprecation runs, the evidence remains inadmissible because its probative value is greatly outweighed by the combined dangers of unfair prejudice and jury confusion. Inasmuch as the letters and the October 1 telephone calls have somewhat different nuances, we will consider them separately.

A. *The Letters.* Appellant asserts that the letters are entirely dissimilar from the menacing October 30 call which comprised the centerpiece of his indictment. He points out that the *modi operandi* (mail versus telecommunications) were completely different, and that the content of the letters, on the one hand, and the content of X's call, on the second hand, varied so substantially that they could not be found to bear the common signature which Rule 404(b) requires.

Broadly defined, letter writing and telephone talk are both means of communication, expression, and petition. To be sure, the former involves a different method of outreach than the latter, but that difference, standing alone, is not dispositive. In Rule 404(b) parlance, similarity can be defined on various levels. If the law required that, as a condition of admissibility, one act be a carbon copy of another, then the rule would be robbed of all vitality. Like an exercise in tracking heredity, an exact match is not necessary; if there is a sufficiently striking family resemblance, the fact that a feature here or a mark there may vary is not enough to destroy the requisite degree of probability. In this case, contrasting the written communiques to the charged call yields numerous substantial and distinctive points of agreement which, in our view, are more than ample to constitute the requisite signature notwithstanding the deviant modes of communication.

First of all, the subject of both the letters and of X's call was Ingraham's litigation against the University of Maine, a topic which a jury could easily infer was of extremely limited interest to the public at large. Indeed, the subject strays so far from the beaten path that the likelihood of pure coincidence is miniscule. In addition, the call captured the essence of the letters: it evidenced an obsession with the vindication of Ingraham's supposed rights through the pending civil litigation, and made demands specifically related to that litigation. The letters frequently discussed appellant's unstinting efforts to enlist the media in aiding and bringing publicity to his cause; the October 30 call—the avowed purpose of which was to coax the reporter into conveying certain demands to Governor Brennan—was, it would seem, an attempt to accomplish that very goal. Perhaps most significantly, X threatened the lives of precisely the same officials who had been targeted in the correspondence. And, X mentioned Ingraham's birth name —"MacKeil"—a datum which was not likely to be within the ken of a casual passerby.

To be sure, the letters and the telephone call do differ to some extent in content as well as form. Appellant points to the frequent written references to Governor Bren-

nan as "Joe Liberal" and to the ongoing litigation as "the nutcracker game"—references which were missing from the telephone call. He notes that X's allusion to the Front did not derive explicitly from the correspondence, and that the oral insistence upon the arrest of Ingraham's foes departs somewhat from the earlier written demands (which tended to be for money or for retraction of unflattering journalistic accounts of the litigation). But, given the host of important comparables, the discrepancies—though themselves not unimportant—go to the weight of the challenged evidence, not to its admissibility.

In deciding whether the evidence was relevant to the caller's identity, the district court had a responsibility to focus on the totality of the comparison, not merely to flyspeck the call in search of differences. In constructing the calculus, disparities must be weighed even-handedly against similarities, giving due measure to the number of each and to the distinctiveness *vel non* of the attributes. Generally, where we have sanctioned the admission of such proof, the comparison has "involved the conjunction of several identifying characteristics or the presence of some highly distinctive quality." *Pisari*, 636 F.2d at 859. The more distinctive the identifiers, the fewer of them need be present to demonstrate the requisite signature. *E.g., United States v. Baldarrama*, 566 F.2d 560, 568 (5th Cir.) (rarity of white heroin in San Antonio area sufficient, with other facts, to make uncharged crime admissible as proof of identity), *cert. denied*, 437 U.S. 906, 98 S.Ct. 3094, 57 L.Ed.2d 1136, *cert. denied*, 439 U.S. 844, 99 S.Ct. 140, 58 L.Ed.2d 145 (1978).

In the instant case, the letters and the call were in what amounted to a sequence, positioned along a time continuum in such a manner as to suggest a relationship. That the former were probative of the latter was made manifest both by the multiplicity of the similarities and by their distinctiveness. It is readily apparent, on the most casual examination, that the maker of the illicit call (X) and the author of the letters (concededly, Ingraham) shared a peculiar obsession with the same obscure liti-

gation. They shared, too, an unusual campaign to commandeer the assistance of the same four public officials—an odd quartet drawn from federal and state government, and from the executive, legislative, and judicial branches—threatening them with dire consequences if they demurred. Both the letters and the call sought to extract something of retributive value—money, retraction of adverse stories, punishment of enemies—in relation to the perceived mistreatment of Ingraham/MacKeil. It beggars credulity to argue that so striking a set of seldom seen similarities was but some strange coincidence. Rather, common sense underwrites the conclusion that these shared characteristics were so idiosyncratic as to constitute a signature—a signature sufficient to validate an inference that the person who wrote the letters also made the call. *See Pisari*, 636 F.2d at 859; *Parker v. United States*, 400 F.2d 248, 252 (9th Cir.1968), *cert. denied*, 393 U.S. 1097, 89 S.Ct. 892, 21 L.Ed.2d 789 (1969). And, the (distinctive) likenesses easily overbalance the (less significant) differences in the form and content of the communications. As we have said, "some variation in the peripheral facts ... does not lessen the probative value of [the] evidence," nor bar its admissibility. *Scelzo*, 810 F.2d at 4. Like images in a many-sided mirror, the letters, though distorted at certain angles, formed a composite which faithfully reflected the singular distinctiveness of the charged call. Thus, we conclude that the correspondence was relevant to the question of X's identity.

■ Nor did the district court abuse its discretion in ascertaining that the probative value of the evidence outweighed any untoward effects. While there is no question that the letters were incriminating, they were not unfairly so. *See Onujiogu v. United States*, 817 F.2d 3, 6 (1st Cir.1987) (all evidence is meant to be prejudicial; only unfair prejudice must be avoided). There was little risk of any confusion. The district court must be accorded "considerable latitude" in its Rule 403 determinations. *United States v. King*, 827 F.2d 864, 867 (1st Cir.1987) (per curiam). *See also Unit-*

ed States v. Andiarena, 823 F.2d 673, 677–678 (1st Cir.1987); Cintolo, 818 F.2d at 998; United States v. Tierney, 760 F.2d 382, 388 (1st Cir.), cert. denied, 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985); cf. Lau, 828 F.2d at 874 (noting that trial judge "is more directly familiar than a court of appeals with the need for the evidence and its likely effect on the jury"). Given the high probative value of the letters, there is not the slightest basis for arguing that the court's discretion was misused in admitting this evidence. Moreover, after the letters were introduced, the district judge offered to give an immediate limiting instruction concerning the appropriate use of evidence of other acts. Ingraham turned thumbs down on this proposal. Having abjured an instruction which would have served further to reduce any cognizable risk of confusion or unfair prejudice, it comes with particularly poor grace for the defendant now to complain that he was harmed because the jury might have misconstrued the purpose for which the letters were admitted. See United States v. Griffin, 818 F.2d 97, 106 (1st Cir.1987).

B. *The Telephone Calls.* Appellant also contests the propriety of admitting testimony relating to the two anonymous telephone calls made on October 1, 1985. Ingraham urges us to hold that these calls did not qualify as Rule 404(b) evidence because the government failed to show that he made them. We find the challenge to be unavailing.

■ There is no question that the authentication standard of Fed.R.Evid. 901(a)[3] requires the prosecution to establish that the defendant committed an offense before that offense can be admitted as evidence of "other crimes, wrongs or acts" under Rule 404(b). *See United States v. Dothard,* 666 F.2d 498, 502 (11th Cir.1982). Though it is clear that the government need not prove the defendant guilty of the uncharged "bad act" beyond a reasonable doubt, it is much less clear precisely what burden of proof must be shouldered. The circuits are in considerable disarray. The Supreme Court, although it has now granted certiorari in a case likely to resolve the dilemma, *see United States v. Huddleston,* 811 F.2d 974 (6th Cir.) (per curiam), *cert. granted,* —— U.S. ——, 108 S.Ct. 226, 98 L.Ed.2d 185 (1987), has not heretofore spoken on the point.

The decided cases suggest that, in at least four circuits, the trial judge must make a preliminary determination that there is clear and convincing evidence connecting the defendant to the "bad act" as a condition precedent to admissibility of the evidence. *United States v. Estabrook,* 774 F.2d 284, 288 (8th Cir.1985) (government must "prove by clear and convincing evidence the [defendant] committed the extrinsic acts"); *United States v. Mascio,* 774 F.2d 219, 223 (7th Cir.1985) ("when evidence of prior crimes is introduced, it must be clear and convincing"); *United States v. Bailleaux,* 685 F.2d 1105, 1109–10 (9th Cir. 1982) (similar); *United States v. Shelton,* 628 F.2d 54, 56 (D.C.Cir.1980) (similar).

Other, equally well respected, courts have adopted a less rigid stance. The Second Circuit, for example, has allowed "bad act" evidence when proven by a fair preponderance, specifically rejecting any stricter criterion. *United States v. Leonard,* 524 F.2d 1076, 1090–91 (2d Cir.1975), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976). The Sixth Circuit agrees with this approach. *See United States v. Huddleston,* 811 F.2d at 975–77 (vacating 802 F.2d 874 (1986)); *United States v. Ebens,* 800 F.2d 1422, 1432 (6th Cir.1986). Insofar as we can determine, the question is still an open one in the Third Circuit. The Tenth Circuit, which likewise appears not to have enunciated an ironclad rule on the point, has observed that "[t]here must be a clear and logical connection between the alleged earlier offense or misconduct and the case being

---

**3.** Fed.R.Evid. 901(a) reads as follows:

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

tried." *United States v. Biswell*, 700 F.2d 1310, 1317–18 (10th Cir.1983).

Three other circuits have refused to single out such evidence for special treatment, choosing simply to follow the usual convention of Fed.R.Evid. 104(b).[4] The seminal case for this proposition is *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). *Beechum* reversed earlier Fifth Circuit precedent which had applied the "clear and convincing" standard to extrinsic offense evidence. *Id.* at 910 & n. 12. *Beechum* has been followed in at least two other circuits. *See, e.g., United States v. Martin*, 773 F.2d 579, 582 (4th Cir.1985); *United States v. Edwards*, 696 F.2d 1277, 1280 (11th Cir.) (per curiam), *cert. denied*, 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983). The resultant standard is apparently no more rigorous—and perhaps more lenient—than the preponderance rule. *See id. See also United States v. Nahoom*, 791 F.2d 841, 845 (11th Cir.1986). Indeed, the standards may be functionally equivalent. In *Huddleston*, for example, a Sixth Circuit panel originally advocated the "clear and convincing" test, *see* 802 F.2d at 877, but shifted gears on rehearing to adopt the preponderance test. 811 F.2d at 977. In so doing, the panel indicated that it viewed *Beechum* as fully consistent with the Second Circuit precedent and with the preponderance standard. *Id.* at 976–77. Yet we digress: whether or not there is a practical difference between the postulates of *Leonard*, on the one hand, and those of *Beechum*, on the other, we leave for another day and for a closer case.

While we have not had occasion explicitly to choose among these approaches, we note that our recent opinion in *Lau* eschews "a separate mechanical evidentiary test" for "bad act" evidence, 828 F.2d at 876, declines to adopt the "clear and convincing" standard, *id.*, and relies on a "sufficient evidence" analysis, *id.* at 876, distinctly reminiscent of Rule 104(b) and of *Beechum* and its progeny. *See also Andiarena, supra*, 823 F.2d at 678 (citing *Beechum* with approval, but without discussing quantum of proof required). With the result foreshadowed, we think, by *Lau*, we join today with the Fourth, Fifth, and Eleventh circuits on this point. Rule 404(b) itself contains enough inherent protections—most notably the rule's express prohibition against using such evidence in order to suggest propensity—that no added judge-made prophylaxis is required. The tripartite shielding which already exists—(1) the rule's internal protections, (2) the application of Rule 104(b) to assure relevancy,[5] and (3) the availability of Rule 403 to weigh probative value against unfair prejudice, confusion, or the like—is in our judgment ample to ward off the spectre of misuse. Rule 404(b), as written, strikes a delicate balance between the legitimate needs of the prosecution and the legitimate rights of an accused. There is nothing in the nature of extrinsic offense evidence which necessitates an additional layer of protection.

We hold that, so long as the strictures of the three operative rules—Rules 104(b), 404(b), and 403—were met, the district court possessed the legal power to admit evidence of the October 1 calls. This was true whether or not the evidence that Ingraham made them was "clear and convincing." [6] And, we may interfere with the determination to admit the evidence only if we find that the court abused its discretion. After all, as we have routinely stated, "[t]rial judges have wide discretion in de-

---

**4.** Fed R.Evid. 104(b) reads as follows:

When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

**5.** Rule 104(b), of course, has no special imbrication with Rules 403 and 404(b). To the contrary, Rule 104(b) applies with equal force to evidence admitted under *any* of the rules of

evidence. It is no exaggeration to say that Rule 104(b) stands as the initial sentinel at the gates, watching over the issue of conditional relevancy in a variety of contexts.

**6.** We do not mean to suggest in any way that the government's proof with respect to Ingraham's involvement in the October 1 calls was less than clear and convincing. We simply note that, because of our adoption of the *Beechum* standard, we need not address that point.

ciding whether an adequate foundation has been laid for the admission of evidence." *Real v. Hogan*, 828 F.2d 58, 64 (1st Cir. 1987). It is against this backdrop that we assay the rulings which led to the introduction of evidence of the precursory calls.

■ Appellant draws sustenance for his challenge to the admission of this evidence from the fact that, since the calls were made anonymously, no one could identify him as the caller. In a related vein, he argues that the letters cannot be used to shore up the identification effort, since they, too, were inadmissible. But, that battle has been waged and lost. *See supra* Part II–A. Therefore, the letters may—and do—validly comprise a portion of the predicate upon which the government can rely in demonstrating that the earlier calls were likely made by Ingraham, ergo, admissible.

In respect to these calls, neither of the recipients recognized the caller's voice. They testified that the speaker sounded like a young male, without any detectable accent—a general description, it should be noted, virtually identical with that attributed to X by Adams. Yet, it is a well-settled proposition that someone familiar with the speaker's voice need not identify it before evidence of a call can be admitted. *United States v. Puerta Restrepo*, 814 F.2d 1236, 1239 (7th Cir.1987). Like a wide array of other phenomena, telephone calls may be authenticated by exclusively circumstantial evidence. *See United States v. Drougas*, 748 F.2d 8, 26 (1st Cir.1984); *United States v. Espinoza*, 641 F.2d 153, 170 (4th Cir.), *cert. denied*, 454 U.S. 841, 102 S.Ct. 153, 70 L.Ed.2d 125 (1981); *United States v. Alper*, 449 F.2d 1223, 1229 (3d Cir.1971), *cert. denied*, 405 U.S. 988, 92 S.Ct. 1605, 31 L.Ed.2d 822 (1972). *See also Puerta Restrepo*, 814 F.2d at 1239.

In this instance, the prosecution presented copious evidence of similarities between these calls and Ingraham's letters. The government made a like showing in comparing these calls to the October 30 call. Many of these similarities were of a distinctive sort. By way of illustration, both of the October 1 calls referred specifically to the suits against the University of Maine and demanded retractions of news stories concerning the litigation. According to the A.P. reporter, the caller also insisted that $5,000,000 be paid by the defendants. Then too, Governor Brennan was referred to in the October 1 calls as "Joe Liberal" —a hallmark phrase found repeatedly in Ingraham's correspondence. In both calls, threats to kill the Governor were bruited about. In the call to Channel 5, the lives of Senator Mitchell and Judge Carter were menaced, the name "MacKeil" was mentioned, and the speaker held himself out as a spokesman for the Front. The points of resemblance between these calls and the charged call were unmistakable. And, in much the same way that the likenesses between the October 30 call and the letters were so idiosyncratic that the correspondence could be considered signature evidence probative of the identity of the caller, *see supra* Part II–A, the analogies between Ingraham's letters and the October 1 calls constituted a body of substantial signature evidence which was more than enough to give rise to a supportable inference that Ingraham made those calls. Under the circumstances, we find that the district court did not exceed its discretion in determining that there was sufficient evidence that Ingraham placed the precursory calls. There was likewise enough in the record to support the ruling that these calls comprised suitable Rule 404(b) material.

■ Nor did the court abuse its discretion in factoring the probative value/prejudicial impact equation under Fed.R.Evid. 403. The evidence was inculpatory—but it was not the type of proof which was likely to inflame the passions of a jury which had already (properly) become familiar with the contents of the letters.[7] The October 1 incidents were decidedly probative as to X's

---

7. When evidence of the first of the October 1 calls was introduced, the district judge sought to palliate any risk of unfair prejudice by instructing the jury on the restricted uses of testimony admitted under Rule 404(b). When evidence of the second call was admitted, appellant's counsel expressly implored that no such charge be given. The district court honored the request.

identity. If the jury found that Ingraham made these calls, it could well have concluded that he changed his *modus operandi* at that point, thus setting the stage for essaying the charged call. Such a finding, in turn, could have borne directly on the issue of identity. *See United States v. Johnson,* 820 F.2d 1065, 1069 (9th Cir.1987) (in bank robbery case where methodology in earlier heist was similar, but not identical, "similarity of the *modi operandi* help[ ] identify the robber"). Because the unknown in the case was whether X = Ingraham, the probative worth of this evidence far outstripped any *unfairly* prejudicial effect. The jury was entitled to consider these calls in determining whether or not it was Ingraham who, on October 30, reached out to touch someone.

## III. THE BAIL HEARING

█ Appellant also assigns error insofar as the admission into evidence of certain statements which he made to a magistrate at his bail hearing. These remarks consisted principally of an harangue against Ingraham's perceived enemies at the University of Maine. He stated, for example, that he wanted "an aggressive, vigorous federal criminal civil rights investigation of various people at the University of Maine." He calumnized federal officials for failing criminally "to prosecute those people." Near the end of his soliloquy, he declaimed:

> I have spent 6, 7, 8 years of my life fighting the University of Maine, pleading with these people to intervene, to stop these ridiculous criminal trespass arrests, to lift an admission and employment ban, to readmit me into school, to let me do something with my life instead of fighting them years and years and years, pleading with them to cease with their oppression and to literally force me to flee the State of Maine.…

Ingraham now claims that it was improper to use these remarks against him because he was placed in an unconscionable dilemma at the time: he could remain silent (and forgo his right to bail) or speak out (thereby forfeiting his privilege against self-incrimination). He relies for support on *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and *United States v. Perry,* 788 F.2d 100 (3d Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 218, 93 L.Ed.2d 146 (1986). We find neither precedent to be controlling in this instance.

In *Simmons,* the Supreme Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt.…" 390 U.S. at 394, 88 S.Ct. at 976. Ingraham, asseverating that bail proceedings are analogous to suppression hearings, urges us to adopt a rule similar to that forged in *Simmons,* to the end that whatever might be said by an accused at a bail hearing could not be used against him at an ensuing trial on the same charge. We declined to approve such a blanket exclusion in *United States v. Melanson,* 691 F.2d 579, 583–84 (1st Cir.), *cert. denied,* 454 U.S. 856, 102 S.Ct. 305, 70 L.Ed.2d 151 (1981), on the theory that the two types of hearings are fundamentally different and, therefore, do not warrant identical treatment. *Id.* at 584. And we have no occasion to retreat from *Melanson* today.

In a suppression hearing, a defendant must frequently divulge the facts of his case in order to protect his rights. If those revelations could subsequently be used against him at trial, the defendant would, indeed, be caught between Scylla and Charybdis; he would be forced to choose between his fourth amendment right to deprive the prosecution of the fruits of an illegal search or seizure and his fifth amendment right to refuse to convict himself out of his own mouth. Yet bail hearings, though important, are a fundamentally different breed of cat. As we stated in *Melanson,* "[a]n accused's bail rights are not so contingent on his ability to speak without fear of the future use of his testimony that he must, by analogy to *Simmons,* be granted a blanket immunity from use of all statements made during an initial hearing." *Id.* at 584. *Accord United States v. Dohm,* 618 F.2d 1169, 1173 (5th Cir.1980). The information required is often less central to the nub of the case. It

may in large part concern the accused's employment record, family status, ties to the community, past history, and the like, as opposed to his participation (or not) in a discrete transaction or event, or series of transactions or events. Furthermore, the needed input can usually be obtained from sources other than the suspect's own testimony. *Cf., e.g., United States v. Acevedo-Ramos,* 755 F.2d 203, 208 (1st Cir.1985) ("[T]he new Bail Act[ ] did not change pre-existing law, which, as a general matter, allowed a magistrate or judge to consider hearsay evidence and to rest a determination upon that evidence"). Therefore, "a magistrate can in virtually all cases honor an accused's right to remain silent or to be represented by counsel and still set appropriate bail." *Melanson,* 691 F.2d at 584.

The appellant asks that we set *Melanson* aside. In this beseechment, Ingraham stresses his view that the enactment of the Bail Reform Act of 1984 (Act), 18 U.S.C. §§ 3062, 3141–3150 (1984), and the Act's endorsement of pretrial detention in a broadened array of cases, *see* 18 U.S.C. §§ 3142(e)–(g), has altered the legal landscape. In particular, he takes comfort in *Perry,* a case arising under the Act. There, the defendant was charged with violating federal narcotics laws and thus slipped neatly within the integument of the rebuttable presumption created by 18 U.S.C. § 3142(e), to the effect that "no condition or combination of conditions [ancillary to release on bail] will reasonably assure the safety of any other person and the community."[8] The Third Circuit found that if a defendant in this situation is to avoid being subjected to preventive detention as a result of the statutory presumption, he can best rebut it with his own testimony—testimony which will, potentially, be self-incriminating. *Perry,* 788 F.2d at 115. The court, concerned that this concatenation of events implicated the accused's fifth amendment rights, resolved the perceived conflict by authorizing the judicial grant of use-fruits immunity in such a situation. *Id.* at 115–16.

Although we agree that the geography and terrain of pretrial release were reshaped in meaningful ways by the passage of the Act, we need not reach the pregnant questions which the appellant strains to raise. This case does not call upon us to determine whether or not, in certain (as yet hypothetical) types of circumstances, the new pretrial detention provisions of the Act may call for some departure from the teachings of *Melanson.* Nor does the case before us require that we approve or disapprove the reasoning and result in *Perry.* The fifth amendment concerns with which the Third Circuit grappled in *Perry* pertained specifically to the accused's need to rebut a statutory presumption—a presumption which, if left unchallenged, would alone suffice to deprive the suspect of his liberty. Yet, the § 3142(e) presumption is applicable exclusively to a limited class of defendants and is triggered only upon motion of the government. *See* 18 U.S.C. § 3142(f). Ingraham was not a person to whom the presumption applied, and the government did not attempt to brand him with its rigors by filing a detention motion. *Perry* is thus readily distinguishable.

What is more, despite the passage of the Act, Ingraham did not fall into any of the Act's novel niches. His arraignment took place in a legal environment substantially the same as that which prevailed in *Melanson.* The elements to be considered by the magistrate vis-a-vis pretrial release included, as was true before the Act became operative, a variety of factors beyond the nature and circumstances of the offense. Hearsay evidence was admissible. The appellant was represented by counsel at the bail hearing. Before he launched into his philippic, he was fully apprised of his fifth amendment rights by the magistrate. Despite this warning, Ingraham nonetheless insisted that he be allowed to speak in his own behalf. To be sure, he now argues that the magistrate's admonition was too brief, ambiguous, and attenuated to be effective—but the cold record belies the

---

**8.** The constitutionality of the Act's authorization of pretrial detention predicated upon the rebuttable presumption of future dangerousness was recently upheld in the Court in *United States v. Salerno,* —— U.S. ——, 107 S.Ct. 2095, 2098, 95 L.Ed.2d 697 (1987).

claim. The warning quite clearly informed the defendant that he was "not required to make any statement to anybody" and that, if he did so, the remarks could be used as evidence against him. The advice, given as it was to one whose attorney was at his side, passed muster.

The last straw is that Ingraham's freedom was not meaningfully at stake. At the time of the bail proceeding, he was incarcerated in a state penitentiary on an unrelated charge. Regardless of what the magistrate might have concluded at the hearing, Ingraham would have remained in prison. He knew as much. This strongly supports the government's view that the appellant spoke not in an effort to gain his liberty, but because he wanted to hear the sound of his own voice. All in all, there is substantial evidence that when Ingraham made his statements, he knowingly and willingly waived his privilege against self-inculpation. *See United States v. Miller*, 589 F.2d 1117, 1135 n. 17 (1st Cir.1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979).

In sum, we find that *Melanson* controls this case. The appellant was under no external compulsion different than in *Melanson* to make statements to his own behoof at the bail hearing. Moreover, the utterances which he chose to voice comprised a completely voluntary and gratuitous waiver of his fifth amendment rights. We can discern no error in their admission as evidence against him at trial.[9]

## IV. SUFFICIENCY OF THE EVIDENCE

■ We need not dawdle long over appellant's argument that the evidence was inadequate to support a guilty verdict. When such a challenge is made, our task is to determine whether the evidence, taken as a whole and in the light most hospitable to the government, together with all legitimate (favorable) inferences to be drawn therefrom, is such that a rational trier of the facts could have found guilt beyond a reasonable doubt. *Cintolo*, 818 F.2d at 983; *United States v. Paone*, 758 F.2d 774, 775 (1st Cir.1985). While much of the proof against Ingraham was circumstantial, the many interlocking strands ultimately wove a strong and sturdy fabric. The evidence in this case was, we think, more than ample to support the conviction.

In addition to the letters, the October 1 calls, and the statements at the bail hearing, the government showed that Ingraham had gone to Governor Brennan's office and attempted to enlist his aid in defendant's struggle with the university. Agents of the Federal Bureau of Investigation testified that, in an interview in January of 1986, Ingraham detailed his ongoing problems, told them of other efforts that he had made to further his campaign against the school, and admitted writing to the quartet of public officials. The government also introduced evidence of a conversation in which Ingraham expressed great frustration with Judge Carter's dismissal of one of his cases against the university, and speculated that the judge—who was a graduate of the University of Maine and had been a guest speaker on the campus—was biased. There was proof that appellant, in November 1985, had purchased an advertisement in a Portland newspaper suggesting that Governor Brennan be sent to Antarctica. And, there was plethoric evidence indicating consciousness of guilt.

These evidentiary particles, coupled with the startling similarities between the letters, the October 1 calls, and the October 30 call, comprised a convergence of circumstances, a convergence leading inexorably to the conclusion that Ingraham committed the offense with which he was charged. We have repeatedly stated, and today reaffirm, that in a criminal case, "the evidence need not preclude every reasonable hypothesis inconsistent with guilt" in order to sustain a conviction. *United States v.*

9. In view of our holding in this respect, we have no need to reach the appellee's alternative contention that, if it was error to admit the utterances, the error was harmless. We are constrained to observe, however, that the strength of the government's case seems hardly to have been enhanced by what Ingraham said at the bail session. Moreover, the tirade contained little—if anything—which was not fully subsumed by the aggregate text of the thirty letters.

*Guerrero-Guerrero,* 776 F.2d 1071, 1075 (1st Cir.1985), *cert. denied,* 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986). It is enough that, as here, a rational jury could look objectively at the proof and supportably conclude beyond reasonable doubt that the defendant's guilt had been established.

Ingraham contends that, inasmuch as his dissatisfaction with the university was public knowledge—at least one article about it had been published in Maine newspapers—virtually anyone could have made the call, mentioning his name and making threats in his stead. While this is, of course, a possibility, it is altogether implausible that X was anyone other than Ingraham. (There was not a shred of evidence pointing to any other person as the perpetrator of the call or to an attempt to "frame" the defendant.) Who else, one might ask, would be sufficiently interested in furthering so highly personal a cause that he would threaten the lives of four prominent public officials? Who else would be so determined to see a small fortune paid to a frondeur to redress some petty grievance? Who else would be so vindictive as to urge the arrest of all the defendants in an obscure civil suit? The questions, we suggest, provide their own answers. The law is not so struthious as to compel a criminal jury to ignore that which is perfectly obvious.

Our legal system looks to jurors to "come up with answers that reflect the common-sense view of the community ... [and] we must accept the jury's answers unless unreasonable." *Id.* In this case, the evidentiary fragments, though circumstantial, were plentiful. And, like iron filings drawn by a magnet, they arranged themselves into a distinctive pattern—a pattern which pointed unerringly in the direction of the appellant. The jury's verdict was an eminently reasonable one, superimposed upon solid (albeit circumstantial) evidence. We have no warrant to intrude into an area of judgment reserved to the factfinders, and we decline Ingraham's invitation that we do so.

## V. CONCLUSION

Suffice it to say that we believe all of the challenged evidence was properly admitted in this case. That evidence, taken in conjunction with the other proof presented at the trial, was adequate to allow a thoughtful, dispassionate jury to find Ingraham guilty beyond any reasonable doubt. And, although other points have been raised on this appeal, none possess enough substance to merit extended discussion. We simply note that all have been considered and rejected.[10]

We need go no further. The defendant was fairly tried and justly convicted. The judgment below must be

*Affirmed.*

---

**10.** Our holding that the evidence was sufficient to sustain a finding that the October 30 caller, X, was Ingraham, is itself dispositive of appellant's argument that there was no proof the transmission occurred in interstate commerce. X told Adams—who was in Maine at the time—that he was calling from New York. Once it was established that Ingraham and X were the same person, that confession became an admission against interest. *See* Fed.R.Evid. 801(d)(2)(A). So viewed, the content of the call, standing alone and unrebutted, was enough proof that the transmission was interstate.