UNITED STATES of America, Appellee,

v.

Pedro R. VICTORIA–PEGUERO,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Fernando W. ANGLADA ALVAREZ,
Defendant, Appellant.

Nos. 89–2189, 90–1045.

United States Court of Appeals,
First Circuit.

Heard July 31, 1990.

Decided Nov. 27, 1990.

Rehearing and Rehearing En Banc
Denied in No. 89–2189 Feb. 15, 1991.

Luis Rafael Rivera, for appellant Pedro R. Victoria–Peguero.

Guillermo Ramos Luina, with whom Harry Anduze Montano, was on brief, for appellant Fernando W. Anglada Alvarez.

Thomas M. Gannon, Atty., U.S. Dept. of Justice, with whom Daniel F. Lopez–Romo, U.S. Atty., and Jorge E. Vega Pacheco, Asst. U.S. Atty., were on brief, for U.S.

Before CAMPBELL, Circuit Judge, BOWNES, Senior Circuit Judge, and SELYA, Circuit Judge.

SELYA, Circuit Judge.

When drug runners chance to ask the marine police for weather advisories, it is fairly safe to predict, as these appeals illustrate, that storm clouds will soon gather. The tale follows.

## I. BACKGROUND

Appellants Pedro R. Victoria–Peguero (Victoria) and Fernando W. Anglada Alvarez (Anglada) were charged in two counts with violating 46 U.S.C.App. § 1903(a) (1988) and 21 U.S.C. § 952(a) (1988),[1] and with aiding and abetting, 18 U.S.C. § 2 (1988). The events leading to the indictment began on the evening of November 16, 1988, when a team of law officers led by Alberto Irizarry Carlo (Irizarry) left Cabo Rojo to conduct a routine patrol of Puerto Rican waters. The team, United Forces for Rapid Action, known by its Spanish acronym as "FURA," consisted exclusively of commonwealth police officers: Irizarry, officer Agosto of the Puerto Rico Police Narcotics Division, and four members of the Puerto Rico Police Marine Division (officers Seda, Ronda, Toro, and Torres). The FURA team left shore, heading south, around 7:00 p.m. About half an hour later, they received a radio message from a boat identifying itself as the M/V CATU. The CATU stated that it was traveling from the Dominican Republic to Puerto Rico and wanted to know the weather conditions along the west coast. Irizarry furnished the requested information and, upon inquiry by the CATU, identified himself as a representative of the marine police. He refused, however, to give a specific answer to the CATU's request concerning the FURA boat's location.

In order to avoid the worsening weather, Irizarry changed direction and headed north toward Mayaguez. Around 9:15 p.m., the FURA boat approached the Puerto Real buoy, located about one and a half miles from shore. In the vicinity of this buoy, Irizarry and Agosto observed a vessel heading west to east. They confirmed the sighting by radar and slowed down to watch the vessel's approach. Soon, the ship radioed the FURA launch, identified itself as the CATU, and inquired if it was heading in the right direction for Puerto Real. Irizarry responded affirmatively, identified himself as the police, and expressed his intention of pulling alongside in order to check the CATU's documentation. Using a variable range marker, he also determined that the boats were roughly 1.5 miles from land.

After the document inspection, Agosto, acting on Irizarry's orders, radioed the Narcotics Division of the San German police. He asked an officer on duty, Lopez, to request authorization from the United States Customs Service to allow the FURA team to board the CATU. Lopez telephoned the federal customs office immediately, relaying the request to Pacheco, an agent on duty that night. Pacheco referred the matter to William Jimenez, the supervisor of the Customs Service's air smuggling group and the principal coordinator of FURA activities. After studying the situation, Jimenez granted permission to board.[2]

Irizarry and his men then boarded and searched the CATU. During the search, Agosto found approximately 65 kilograms of cocaine secreted behind a load of air-conditioner parts in a hard-to-reach compartment. Anglada, Victoria, and two of their shipmates, Sosa and Lora, were arrested. Upon initial interrogation, Anglada made a series of highly incriminating statements.

Eventually, Sosa and Lora became government witnesses. Appellants stood trial and were convicted on both counts.

1. The first of the cited statutes reaches, *inter alia,* foreign vessels that enter this country's territorial waters. It provides in pertinent part:

> It is unlawful for any person on board a vessel ... subject to the jurisdiction of the United States ... to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

46 U.S.C.App. § 1903(a) (1988). The second statute reaches, *inter alia,* foreign vessels that enter this country's customs waters. It provides in pertinent part:

> It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance ... or any narcotic drug....

21 U.S.C. § 952(a) (1988).

2. In actuality, the permission was relayed to FURA twice, once through officer Mercado of the Marine Division and again via agent Lopez in San German.

They now appeal. Finding, as we do, that their myriad arguments are no more fortunate than their quest for meteorological advice, we affirm the judgments below.

## II. FOURTH AMENDMENT ISSUES

The defendants contend that the evidence seized during the search, as well as Anglada's subsequent inculpatory statements, should have been suppressed. They posit three grounds for suppression: (1) the evidence did not support a finding that the search took place at a border; (2) as a matter of law, the members of the FURA team could not act as customs agents; and (3) as a matter of fact, the officers were not authorized so to act. We find this asseverational array to be unconvincing in all its aspects.

### A. Border Searches.

It is axiomatic that warrantless searches are *per se* unreasonable unless they fall within a recognized exception to the warrant requirement of the fourth amendment. It is equally well established that border searches constitute such an exception and are reasonable "by the single fact that the person or item in question had entered into our country from outside." *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977).

■ The sea boundary of United States territory is a marine league (three geographic miles) from shore, *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 122, 43 S.Ct. 504, 507, 67 L.Ed. 894 (1923), and comprises a border for fourth amendment purposes. *See United States v. Zurosky*, 614 F.2d 779, 787 n. 7 (1st Cir.1979), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980); *see also United States v. Stanley*, 545 F.2d 661, 666 n. 6 (9th Cir.1976), *cert. denied*, 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978). Because it is not practical to set up checkpoints at the outer perimeter of a country's territorial waters,

courts have consistently recognized the constitutionality of warrantless searches at the functional equivalent of the sea border, *see, e.g., United States v. MacPherson*, 664 F.2d 69, 72 n. 2 (5th Cir. Unit B Dec. 1981) (three and one half miles from shore is functional equivalent of border); *United States v. Tilton*, 534 F.2d 1363, 1365–66 (9th Cir.1976) (harbor as functional equivalent of border); *see generally Almeida–Sanchez v. United States*, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539–40, 37 L.Ed.2d 596 (1973), as long as those searches satisfy the constitutional requirement of reasonableness.

■ Beyond the three mile limit, Congress has designated the "customs waters" of the United States, 19 U.S.C. § 1401(j) (1988), and authorized federal customs officers to search vessels within those waters, i.e., within twelve miles of shore:

> Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs water or, ... at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, truck, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

19 U.S.C. § 1581(a) (1988). A border search conducted pursuant to section 1581(a) is one of the approved exceptions to the warrant requirement of the fourth amendment. *Zurosky*, 614 F.2d at 787. While it is uncertain what the geographic limits of a seagoing border search may be, the assumption most favorable to appellants is that the evidence must support a finding that the vessel crossed into territorial waters in order to uphold a governmental incursion as a border search. *Id.* at 787–88.[3]

---

**3.** Adopting this assumption eliminates any occasion for us to examine the fourth amendment implications of a warrantless search taking place in the intermediate area between territorial waters (three miles) and customs waters (12 miles). Although we need not decide the question here, we note suggestions elsewhere that this intermediate area may be considered the functional equivalent of the border. *See MacPherson*, 664 F.2d at 72 n. 1; Note, *High on the*

Here, the trial court determined that the CATU was within territorial waters when it was hailed. We review such a finding under the clearly erroneous rule. *See, e.g., United States v. Aguirre,* 839 F.2d 854, 857 (1st Cir.1988) (factfinding on suppression motion subject to clear-error review); *United States v. Figueroa,* 818 F.2d 1020, 1024 (1st Cir.1987) (same). The evidence was in some disarray. Irizarry, for example, testified that the boats were 1.5 miles from shore (well within the territorial limit) and substantiated this statement by reference to his use of the variable range marker. Sosa, on the other hand, testified that the search of the CATU took place 6.5 miles from shore. Such sharp conflicts in the evidence are grist for the trial court's mill. Given the ample evidentiary predicate, we cannot say that the court below erred in finding that the two boats were only 1.5 miles from shore when the boarding occurred or in ruling that the search took place at the functional equivalent of a border.

### B. Legality of Designation.

■ Appellants' second contention is that, as a matter of law, the FURA officers could not be designated as customs officers and, therefore, could not conduct a border search. 19 U.S.C. § 1401(i) (1988) defines "customs officer" in connection with searches conducted pursuant to section 1581(a) as:

> [A]ny officer of the United States Customs Service of the Treasury Department ... or any commissioned, warrant, or petty officer of the Coast Guard, or any agent *or other person authorized by law or designated by the Secretary of the Treasury* to perform any duties of an officer of the Customs Service.

19 U.S.C. § 1401(i) (emphasis supplied). On its face, then, the statute provides that any person may act as a customs officer, subject only to the limitation of proper delegation. What scant case law there is mirrors this commonsense reading of the statute's plain language. *See, e.g., United States v. Thompson,* 475 F.2d 1359, 1362 (5th Cir.1973) ("By a series of proper delegations, border patrol officers have been designated by the Treasury Secretary as customs agents.").

Without pointing to any other statutory provision indicating a congressional intent to exclude non-federal actors (in this case, Puerto Rico police officers) from eligibility for designation under section 1401(i), appellants ask us in effect to read the words "other person" out of the statute. We will not bow to their wishes. It is black letter law that "[a]ll words and provisions of statutes are intended to have meaning and are to be given effect." *United States v. Ven-Fuel, Inc.,* 758 F.2d 741, 751 (1st Cir.1985). There is every reason to honor the principle here. *Cf., e.g., Camacho v. Autoridad de Telefonos,* 868 F.2d 482, 489–90 (1st Cir. 1989) (affording broad construction to phrase "other persons" as used in 18 U.S.C. § 2511(2)(a)(ii)). Accordingly, we decline to substitute judicial judgment for legislative judgment or to place limitations on section 1401(i) which were not envisioned by Congress.

Appellants' best selling point to the contrary is that our literalistic reading of section 1401(i) is arguably at variance with the Ninth Circuit's position as articulated in *United States v. Sandoval Vargas,* 854 F.2d 1132 (9th Cir.), *cert. denied,* 488 U.S. 912, 109 S.Ct. 270, 102 L.Ed.2d 257 (1988). In *Sandoval Vargas,* the panel stated:

> Section[ ] ... 1581 represent[s a] special delegation[ ] of authority to customs officials to conduct border searches. That authority has also been extended to immigration and Coast Guard officials. However, Congress has given the authority to conduct border searches *only* to this limited group of officials, and has charged them with the exclusive responsibility for inspecting goods and persons crossing the borders and for interdicting illegal entries. Searches conducted by

*Seas: Drug Smuggling, the Fourth Amendment and Warrantless Searches at Sea,* 93 Harv.L.Rev. 725, 731–38 (1980). Were we to adopt such a suggestion, the conflicting testimony as to the distance from shore would be of no import and any issue as to the exception's applicability would vanish.

other law enforcement agents are not considered border searches, and must therefore meet the traditional demands of the fourth amendment.

*Id.* at 1136 (dictum; citations omitted). Unlike the appellants, however, we do not understand the Ninth Circuit to be attempting to define the term "customs officials" more narrowly than it is defined in section 1401(i). Where Congress, without exceeding its constitutional powers, has set descriptive parameters, courts must follow them—not presume to compose other or different definitions. Thus, in explicating section 1581, the *Sandoval Vargas* court must be understood to have adopted the related statutory definition of customs officer as contained in section 1401(i), if only *sub silentio.*

Our understanding of *Sandoval Vargas* is fortified by an analysis of the opinion as a whole. In that case, the court upheld a border search conducted by customs officials. *Id.* at 1133. The quoted passage is dictum, merely echoing the holding of *United States v. Soto–Soto,* 598 F.2d 545 (9th Cir.1979). In *Soto–Soto,* a search was conducted by an FBI agent unconnected to the customs service in the course of an FBI operation. *See id.* at 549–50 (the search "was made at the border by an FBI agent as part of a general law enforcement effort ... [the agent] was not working in cooperation with customs agents") (citations omitted). The *Soto–Soto* court held that, on those facts, the search, although conducted at a border checkpoint, was not a border search, and hence, invalid. *Id.* at 549–50.

The facts in the instant case are radically different. The FURA officers were not freelancers, but were part of a coordinated customs effort designed to prevent the importation of illegal drugs. When Irizarry's team boarded the CATU, they knew that the boat had not gone through customs; their sole purpose was to conduct a customs search. The defendants cannot seriously contend that the FURA team was operating as part of a non-customs-related venture or that it was not cooperating with the Customs Service.

Defendants' second sales pitch is even more strained. They urge that *Torres v. Puerto Rico,* 442 U.S. 465, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979), prohibits reading section 1401(i) to permit Puerto Rico police officers to accept designation as federal customs officers. We cannot agree. *Torres* stands for the unremarkable proposition that, because Puerto Rico lacks sovereign authority to prohibit entry into its territory, border searches in the commonwealth must be conducted by federal officials. *Id.* 442 U.S. at 473, 99 S.Ct. at 2430. A Puerto Rico police officer cross-designated as a customs officer pursuant to 19 U.S.C. § 1401(i) and duly authorized to act as such, however, is a federal officer while acting within the scope of the designation and authorization. He may, therefore, conduct border searches, notwithstanding the *Torres* mandate.

We conclude that, given a valid chain of delegation from the Secretary of the Treasury, Puerto Rican police officers could, as a matter of law, be designated to act as customs officers under the "other person" language of section 1401(i). This leaves open the question, to which we now turn, of whether the delegation was proper in this case as a factual matter.

### C. *Validity of the Delegation.*

■ Appellant contends that, even if the FURA officers could, as a matter of law, be cross-designated as customs officials, they were not duly designated in this instance. Our odyssey along the chain of delegation begins with the statute, which provides for designation by the Secretary of the Treasury. 19 U.S.C. § 1401(i). From aught that appears, the appellants have conceded the propriety of the Secretary's delegation of this authority through the Commissioner of Customs to the Regional Commissioners. Treasury Department Order No. 165, Revised, 19 Fed.Reg. 7,241 (T.D. 53654 (1954)); Customs Delegation Order No. 48, 38 Fed.Reg. 30,455 (T.D. 73–302 (1973)). The Regional Commissioner having jurisdiction in Puerto Rico was George Heavey.

The evidence indicated that Heavey, on behalf of the Customs Service, entered into an agreement with the Puerto Rico police regarding "Designation of Employees of the Puerto Rico Police Department as Customs Officers." Under the agreement, Puerto Rico police officers, after being trained by Customs, would be designated as "customs officers (excepted)." They could operate as federal customs officers subject to certain strictures. For our purposes, the most relevant constraint was

> that Customs officer designations to employees of the Puerto Rico Police Department [ ] be used only in situations when there has been specific advance approval by the Customs Watch Commander and only to the extent approved by the Customs Watch Commander and for the duration of the specific law enforcement activity for which the approval was gained.

Agreement ¶ B(2). In line with this constraint, the designation forms received by Irizarry, Agosto, and their fellow officers stated that they could only act as customs officers "[w]hen authorized by the U.S. Customs Service Special Agent–in–Charge or Watch Commander."

Appellants start their efforts to unlink the chain of delegation by questioning the tensile strength of these documents. As to the inter-agency agreement, appellants make much of the fact that the copy produced by the government before trial was not countersigned by a representative of the Puerto Rico police department. This perceived weakness is easily overcome; a duly countersigned copy of the agreement was entered into evidence at the trial. Next, the defendants hypothesize that the individual officers' designation forms were invalid because Heavey's signature was merely a rubber stamp. We hold that the validity of the designation is not affected by the fact that the designating officer's signature was mechanically reproduced. *Accord United States v. Prueitt*, 540 F.2d 995, 1001 n. 1 (9th Cir.1976) (dispute over whether document was "signed" or "stamped" is unimportant with respect to legality of authorization), *cert. denied*, 429 U.S. 1063, 97 S.Ct. 790, 50 L.Ed.2d 780

(1977). What matters, we suggest, is that the imprint implemented Heavey's avowed intention; in an affidavit submitted to the district court and not contradicted by other evidence, Heavey stated that the stamp represented his signature and that he authorized its affixation, intending to deputize the officers.

A somewhat closer question stems from appellants' assertion that the FURA officers never obtained permission from the Customs Service "watch commander" before searching the CATU. The title had apparently fallen into some degree of desuetude within the Customs Service: the record does not show that there was any "watch commander" denominated as such in Puerto Rico on the night in question. Moreover, none of the parties points to a statutory or regulatory definition of "watch commander" within the Customs Service, nor have we found one. For lack of a better alternative, we accept the commonsense definition proffered on Anglada's behalf at oral argument that a watch commander is "the officer in charge at the time."

The policemen's designation forms offered two possible sources of approval for specific actions: the "Special Agent-in-Charge" or "Watch Commander." The government admits that no permission was obtained from the Special Agent-in-Charge, Jaime Echevarria. Instead, it was agent Jimenez who authorized the search. Jimenez testified that, when he received the call requesting permission to board the CATU, he was the "functional equivalent" of a watch commander. Defendants argue that this is an inherently implausible conclusion since Jimenez was not at a duty station but attending a baseball game when the call was received. Such an argument, however, takes much too parochial a view of command status. The evidence showed that Jimenez was wearing a beeper as part of his work-related duties while at the ball game; that he responded immediately to the beeper signal; and that he made several telephone calls to ascertain the circumstances and details of the request. Ultimately, he sanctioned the search. All of

these actions were entirely consistent with the idea that Jimenez was the person in charge at the critical moment. Moreover, the absence of evidence that any higher ranking customs official was then on duty bolsters the district court's finding that Jimenez was, indeed, the functional equivalent of a watch commander.

In the last analysis, this finding deserves considerable deference on appeal. Inasmuch as it responded to a mixed question of fact and law, that is, a question which "ask[ed] nisi prius to determine whether certain factors possess, or lack, legal significance in a given case," *Roland M. v. Concord School Comm.*, 910 F.2d 983, 990 (1st Cir.1990), we review it under the clearly erroneous standard. *See id.; see also Sweeney v. Board of Trustees*, 604 F.2d 106, 109 n. 2 (1st Cir.1979) (collecting cases), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980); *cf., e.g., Figueroa*, 818 F.2d at 1024 (applying clearly erroneous standard to district court's determination of probable cause). There is no principled way in which we can disturb the district judge's finding that, on a preponderance of the evidence, the officers had obtained permission to board from the "watch commander." [4]

## III. JURY EMPANELMENT

There are a pair of assigned errors that touch upon jury empanelment. We consider them in the order of their relative importance.

### A. *Voir Dire Questions.*

At the voir dire, the defendants requested that the court ask prospective jurors whether they would give greater credence to the testimony of government agents.[5] The district judge refused the request, believing that the proposed questions were encompassed in his general inquiry. Defendants now argue that this refusal constituted reversible error.

▪ Where government agents are apt to be key witnesses, the trial court, particularly if seasonably requested, should ordinarily make inquiry into whether prospective jurors are inclined to have greater faith in the agents' testimony merely by virtue of their official positions. *See United States v. Anagnos*, 853 F.2d 1, 3 (1st Cir.1988); *United States v. Pappas*, 639 F.2d 1, 4–5 (1st Cir.1980), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981). The phrasing of the inquiry, of course, is up to the judge, *see Ham v. South Carolina*, 409 U.S. 524, 527, 93 S.Ct. 848, 850, 35 L.Ed.2d 46 (1973), but the failure to make any inquiry at all is usually considered to constitute error. *Anagnos*, 853 F.2d at 2–3; *but cf. Therrien v. Vose*, 782 F.2d 1, 4 (1st Cir.) ("*In certain circumstances*, the refusal of a judge to ask prospective jurors questions designed to weed out [pro-government] bias *may* be reversible error.") (emphasis supplied), *cert. denied*, 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 727 (1986). Whether or not such an error necessitates reversal hinges on such factors as

the importance of the government agent's testimony to the case as a whole; the extent to which the question concerning the venire person's attitude toward government agents is covered in other

---

**4.** Since we uphold the district court's factual finding that permission was granted by the watch commander or his functional equivalent, and thus, that there was no deviation from the Customs Service's protocol governing how boarding permission should be granted to designees, we need not consider the government's alternate argument that, under *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), and its progeny, any breach of the protocol would not have sufficed to invalidate the delegation of authority.

**5.** The exact text of the proposed questions was as follows:

1. Do you believe that government agents always say the truth?
2. Do you feel that the testimony of a government agent must be given more weight or credibility than that of other person[s] who are not government agents?
3. Do you believe that government agent[s] because of their official position are always objective individuals?
4. Do you believe that government agents because of their official position always perform their actions properly?

questions on voir dire and on the charge to the jury; the extent to which the credibility of the government agent-witness is put into issue; and the extent to which the testimony of the government agent is corroborated by non-agent witnesses.

*Pappas,* 639 F.2d at 5 (quoting *United States v. Baldwin,* 607 F.2d 1295, 1297–98 (9th Cir.1979)).

█ Here, the government's case was based largely on agents' testimony; public employees testified as to the chain of requested authorization, the boats' distance from shore, the boarding, the search, the contraband's discovery, and Anglada's post-arrest statement. This was certainly a case where the requested queries—or queries like them—could usefully have been propounded. On balance, there was enough that the court, we believe, should have yielded on the point. The more general questions posed by the district judge, while solicitous of the defendants' rights, cannot fairly be read to subsume or replace the requested inquiries.

We rule, however, that the district court's mistake did not amount to reversible error. For one thing, the government's case was very strong. For another thing, the agents' testimony was largely corroborated by two of appellants' shipmates testifying under an agreement with the government.[6] For a third thing, many of the matters on which the agents' testimony was hotly disputed, e.g., the voluntariness of Anglada's post-arrest statement, Jimenez's duty status, the facts anent suppression, were resolved by the judge, not the jury—and the voir dire inquiry was irrelevant insofar as the judge was the factfinder. As to certain other fact-oriented matters, e.g., the scienter question raised by Victoria, *see infra* Part V(B), the issue was less the veracity of government agents—in

deed, Sosa was the principal witness on this point—than the legal purport and sufficiency of a set of facts. Last but surely not least, a potent antidote to potential prejudice was twice administered by the court below. Immediately after the jury was empaneled and before the opening statements, the judge told the jurors:

So I am going to instruct you now that the Government is to call several witnesses who are ... government agents. Their testimony must not be given more weight or credibility than that of other persons who are not government agents. Remember that.

During the charge, the judge hammered the point home:

Remember, as I told you before, that government agents are entitled to no more credibility than any other witness.

These theriacal instructions, coming at both the beginning and end of the trial, were sufficient to counter any harm caused by the judge's omission of the requested voir dire inquiries. *See United States v. Noone,* 913 F.2d 20, 33–34 (1st Cir.1990) (correct jury instructions at close of trial cured whatever mistaken impression was left at voir dire); *United States v. Gelb,* 881 F.2d 1155, 1164–65 (2d Cir.) (error in refusing voir dire questions found harmless where, *inter alia,* court properly charged jury about assessing credibility of law enforcement witnesses and incriminating testimony did not come exclusively from those witnesses), *cert. denied,* —— U.S. ——, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989); *Pappas,* 639 F.2d at 4–5.

### B. *The Jury Pool.*

█ Defendant Victoria objects to the method by which the venire was summoned for jury service—in particular, to the jury clerk's decision, in the face of a shortfall in

---

**6.** Although our precedents leave the import of corroboration somewhat murky in this type of case, *compare Pappas,* 639 F.2d at 5 (corroboration is an element to be considered) *with Anagnos,* 853 F.2d at 4 (questioning whether credibility problems of government agents can be erased by corroboration from other witnesses), we are of the opinion that, in a harmless-error inquiry which must ultimately depend on prob-

abilities, *cf. United States v. Ladd,* 885 F.2d 954, 957 (1st Cir.1989) (where error not of constitutional dimension, reversal unnecessary so long as it is "highly probable" that the error did not affect the outcome); *United States v. Hernandez–Bermudez,* 857 F.2d 50, 53 (1st Cir.1988) (same), the presence or absence of corroborative evidence is a factor deserving of weight.

the jury pool, to summon by telephone six jurors who had finished their normal term of jury service two years earlier.[7] He claims that this practice deprived him of his sixth amendment right to a jury representative of a fair cross-section of society.

We need not linger long over this objection. The six recycled venire persons were identified as potential jurors according to a neutral, nondiscriminatory criterion: completion of a month's jury service in the court more than two years before. We have examined much this same question before, *United States v. Ramirez*, 884 F.2d 1524 (1st Cir.1989), and determined that the practice constituted neither a constitutional abridgement nor a substantial violation of the Jury Selection and Service Act, *id.* at 1529–30, even where the recycled jurors were not, as here, *ordered* to appear but merely *requested* to appear. *Ramirez* controls. The fair cross section requirement was in no way frustrated.[8]

## IV. THE CHARGE

■ A defendant is entitled to an instruction on his theory of defense so long as it is a valid theory and there is evidence sufficient for a reasonable jury to find in his favor on it. *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988); *United States v. Rodriguez*, 858 F.2d 809, 813 (1st Cir.1988). He is not, however, entitled to instructions on matters that are properly decided by the court rather than the jury.

In this wise, appellants contend that the district judge improperly refused to instruct the jury to acquit if it found that agent Jimenez was not the watch commander. We disagree. The question whether Jimenez was the watch commander was a factual determination to be made as part of the fourth amendment inquiry

rather than an element of the substantive offenses with which the defendants were charged. The admissibility of evidence acquired during a search is a question for the trial judge and outside the province of the jury. *See Lego v. Twomey*, 404 U.S. 477, 490, 92 S.Ct. 619, 627, 30 L.Ed.2d 618 (1972). The judge, therefore, correctly declined defendants' invitation to submit the question to the jury. *See United States v. Donaldson*, 793 F.2d 498, 503 (2d Cir.1986) (instruction properly refused where it "would have, in essence, put to the jury the issue of [defendant's] assertion of his perceived fourth amendment rights after the district court had properly decided [that issue]"), *cert. denied*, 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987).

## V. EVIDENTIARY SUFFICIENCY

Victoria attacks the sufficiency of the evidence in three respects, maintaining (1) that the evidence did not support a finding that the CATU was searched within territorial waters; (2) that the evidence was insufficient to establish Victoria's knowledge and intent; and (3) that a rational juror could not find that Jimenez was the watch commander. The arguments are sheer persiflage.

■ In reviewing the lower court's denial of a motion for judgment of acquittal under Fed.R.Crim.P. 29, we consider the evidence as a whole in the light most favorable to the government. *E.g., United States v. Jimenez–Perez*, 869 F.2d 9, 10 (1st Cir.1989); *United States v. Ingraham*, 832 F.2d 229, 239 (1st Cir.1987), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988). The government may prove its case entirely by circumstantial evidence and need not exclude every reasonable hypothesis of innocence, provided

---

**7.** What transpired was so much like what happened in *United States v. Ramirez*, 884 F.2d 1524 (1st Cir.1989), a case arising in the same district at about the same time, that no useful purpose would be served by reciting the details. Instead, we refer the interested reader to Judge Bownes' lucid account of how the venire was augmented. *Id.* at 1525–27, 1530. The only significant difference cuts in favor of the government: whereas "extra" talesmen in *Ra-*

*mirez* were given the option to appear, *id.* at 1525, the six "extra" venire persons in this case were given no choice.

**8.** While not necessary to our result, we note in passing the record does not show that any of the six recycled venire persons actually served on appellants' petit jury (although one was called as an alternate).

the record as a whole supports a conclusion of guilt beyond a reasonable doubt. *Ingraham,* 832 F.2d at 239–40; *United States v. Smith,* 680 F.2d 255, 259 (1st Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983). We apply these criteria to Victoria's challenges.[9]

### A. *Territorial Waters.*

■ Although the location of the CATU had jurisdictional implications to be decided by the court, *see supra* Part II(A), it was also a material element of both offenses of conviction, *see supra* note 1, and as such, had to be decided anew by the jury. *See United States v. Maynard,* 888 F.2d 918, 926 n. 4 (1st Cir.1989); *United States v. Potes,* 880 F.2d 1475, 1478 n. 1 (1st Cir. 1989).

At the bottom line, Victoria gains nothing by this double dip. The jury's resolution of the point in a manner favorable to the prosecution cannot be faulted. The testimony of Irizarry and Agosto that the CATU was 1.5 miles from shore, although contradicted by other testimony, was enough to sustain the verdict. *See United States v. Passos–Paternina,* 918 F.2d 979, 983 (1st Cir.1990) (appellate court must "resolve issues of credibility in favor of the verdict"). Taking the evidence in the light most favorable to the government, we cannot say that a rational juror could not decide to credit the testimony of the FURA officers on this issue.[10]

### B. *Scienter.*

■ As to Victoria's knowledge and intent, the verdict is unimpugnable. Defendants' shipmate, Sosa, testified that Victoria initially consulted him about buying a new boat; that Sosa, Victoria, and Anglada together went looking for a craft and ultimately decided to purchase the CATU; that Victoria helped to repair the boat be-

fore departure from the Dominican Republic; that Victoria was the one who asked Sosa to pilot the boat to Puerto Rico; that Victoria helped load the air-conditioning equipment behind which the cocaine was found; and that Victoria was the one who paid Sosa for his services. In sum, there was much more here than mere presence; a rational juror could easily conclude that Victoria had full knowledge of the illicit cargo and was a prime mover in the scheme to import the cocaine into the United States. Furthermore, the same evidence was fully adequate to support Victoria's conviction as an aider and abettor under 18 U.S.C. § 2. *See Smith,* 680 F.2d at 260.

The Rule 29 motion was appropriately denied.

## VI. POTPOURRI

Appellants raise a medley of other contentions that, for the most part, can be rejected without specific comment. We briefly mention two of them.

### A. *The Motion for Continuance.*

■ Victoria contends, in a single unsupported sentence at the end of his brief, that the district judge should have granted his motion for a continuance because of the last-minute plea agreement between the government and Victoria's shipmates, Sosa and Lora—a pact which resulted in the two crewmen testifying for the prosecution.

The plaint is meritless for two reasons. First, it is so undeveloped that we can consider it jettisoned. *See Ryan v. Royal Ins. Co.,* 916 F.2d 731, 734 (1st Cir.1990) ("issues adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned"); *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.) (same), *cert. denied,* —— U.S. ——, 110 .S.Ct. 1814, 108

---

9. We need not discuss in this context Victoria's assertion that the evidence was too lean to prove that Jimenez was the watch commander. As mentioned above, *see supra* pp. 83–84, the proof was adequate; and in any event, the question was not one for the jury, *see supra* Part IV.

10. A finding that the CATU was 1.5 miles from shore would satisfy not only 46 U.S.C.App. § 1903(a), which requires that the boat be within territorial waters, but also 21 U.S.C. § 952(a), which only requires presence within the customs waters.

L.Ed.2d 944 (1990). Second, we have consistently accorded trial judges broad latitude in making on-the-spot judgments as to granting or denying continuances. *See, e.g., United States v. Devin*, 918 F.2d 280, 291 (1st Cir.1990); *Zannino*, 895 F.2d at 13–15; *Real v. Hogan*, 828 F.2d 58, 63 (1st Cir.1987). The record on appeal reflects no misuse of this leeway.

### B. *The Post–Arrest Statement.*

■ Anglada challenges the government's use of his post-arrest statement on two grounds. He claims, first, that the statement should have been suppressed as the fruit of the allegedly illegal search of the CATU. But, since we have upheld the search, *see supra* Part II, he cannot prevail on this ground. *See Colorado v. Spring*, 479 U.S. 564, 571–72, 107 S.Ct. 851, 856, 93 L.Ed.2d 954 (1987) ("[a] confession cannot be 'fruit of the poisonous tree' if the tree itself is not poisonous").

Anglada's second claim is that the statement was involuntary. The record belies the assertion. Before speaking to the agents, Anglada was advised of his rights, said that he understood them, and signed a waiver. The record does not even hint at the existence of circumstances showing that his will was overborne because of coercive police conduct. *See Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961) (discussing factors relevant to assessment of voluntariness). Rather, Anglada gratuitously alerted the officers anent his willingness to discuss the smuggle, responded without equivocation to their interview request, and stated repeatedly that he wanted to cooperate. To be sure, there was evidence that Anglada appeared tired and nervous, and expressed fear that his cooperation could put him at risk—but in the absence of police overreaching, such factors do not conclusively establish involuntariness. *See, e.g., Colorado v. Connelly*, 479 U.S. 157, 163–67, 107 S.Ct. 515, 519–22, 93 L.Ed.2d 473 (1986). The district court did not err when it declined to suppress the statement on this basis.

### VII. CONCLUSION

To recapitulate, we conclude that the district court did not err in determining that the search of the CATU was a valid border search conducted by persons duly deputized to act as federal customs officers. The judge's unwillingness to quiz prospective jurors about their receptiveness to "official" witnesses was error, but benign under the circumstances of the case. The jury instructions were acceptable, the evidence of defendants' guilt was solid, Victoria's motion for a continuance was properly denied, and Anglada's post-arrest statement was appropriately admitted. None of the other challenged rulings warrant reversal.

We need go no further. Inasmuch as appellants' flotilla of assigned error cannot ride out the storm, we direct that their convictions be

*Affirmed.*