UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1832

UNITED STATES OF AMERICA,

Appellee,

v.

KEVIN F. O'BRIEN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard L. Williams,* Senior U.S. District Judge]

Before

Selya, Cyr and Boudin, Circuit Judges.

Alan Chapman, with whom Chapman & Chapman was on brief, for

appellant.
Timothy Q. Feeley, Assistant United States Attorney, with

whom A. John Pappalardo, United States Attorney, was on brief,

for the United States.

February 7, 1994

*Of the Eastern District of Virginia, sitting by designation.

SELYA, Circuit Judge. A jury convicted defendant-
SELYA, Circuit Judge.

appellant Kevin F. O'Brien on two hundred ninety counts of

making, or causing to be made, false statements related to

applications for Medicare benefits, and one hundred thirty counts

of converting federal funds to his own behoof.1 After combing

the record, we uphold the verdict.

I. BACKGROUND

We examine the relevant events as a whole, marshalling

the evidence in the light most congenial to the prosecution's

theory of the case. See United States v. Ortiz, 966 F.2d 707,

711 (1st Cir. 1992), cert. denied, 113 S. Ct. 1005 (1993); United

States v. Maraj, 947 F.2d 520, 522 (1st Cir. 1991).

Appellant was the president and sole shareholder of

O'Brien Ambulance, Inc. and its lineal descendant, O'Brien

Ambulance, Ltd.2 As president of the corporation, appellant

served as its chief executive and principal operating officer.

1The statutes of conviction can be succinctly summarized.
One such statute, now repealed and replaced, at the time provided
in pertinent part that any Medicare vendor who "knowingly and
willfully makes or causes to be made any false statement or
representation of a material fact in any application for any
benefit or payment [under the Medicare program]" thereby commits
a felony. 42 U.S.C. 1395nn (1987) (repealed). A second
statute, still in force, provides in pertinent part that whoever
"knowingly converts to his own use or the use of another . . .
any voucher, money, or thing of value of the United States or of
any department or agency thereof" is guilty of a felony. 18
U.S.C. 641 (1988). The indictment with which we are concerned
invokes these statutes and also charges appellant as an aider and
abettor, see 18 U.S.C. 2 (1988).

2Notwithstanding the shifting nomenclature, the entity
remained the same. Consequently, we refer to the firm,
regardless of which appellation claimed preeminence at any given
time, as "the corporation."

2

He, and he alone, possessed authority to sign company checks

during the period covered by the instant indictment, i.e., from

March to August of 1987. During that period, appellant also

acted as the corporation's sole director.

The corporation ran a licensed ambulance service. It

regularly billed Medicare for ambulance services provided to

Medicare recipients, with the result that the federal Medicare

program accounted for a significant portion of corporate

revenues. Many of the corporation's payment requests sought

reimbursement for the transportation of Medicare recipients to

and from approved kidney dialysis treatments. During the period

covered by the indictment, the corporation, in order to maximize

the remuneration associated with such services, regularly

represented various Medicare recipients as bedridden when, in

fact, they were ambulatory; and it also regularly represented

trips for dialysis treatments to have been undertaken by

ambulance when, in fact, the patients had been transported by van

or wheelchair car.3 Corporate records were falsified to

camouflage these untruths. Subsequent investigation uncovered

the scheme, revealing that, in numerous instances, the

corporation's billing practices bore little relation to the

reality of events, and that the corporation had bilked the

3Carriage by ambulance costs substantially more than
carriage by van or wheelchair car. Thus, the Medicare rules
restricted reimbursable ambulance transportation to cases
involving approved treatments for non-ambulatory patients, and,
even then, only if no alternate means of transportation could be
employed without endangering the patient's condition.

3

government out of well over $300,000.

Based on this, and other, evidence including evidence

that, in late 1986 and early 1987, the corporation had been

teetering on the brink of insolvency a federal grand jury

returned an indictment against appellant.4 Evidence presented

at trial showed that, during the six-month period in question,

the corporation routinely transported ambulatory dialysis

patients in vans or wheelchair cars (often as a group), but

nonetheless misrepresented these services in applying for

Medicare stipends, saying that they related to individualized

transportation of non-ambulatory patients via ambulance.

Anticipating appellant's eventual line of defense, the

government presented both live testimony and corporate records

(in the form, inter alia, of run slips, run logbooks, and

documents related to Medicare benefit applications) illustrating

the pervasiveness of the criminal conduct. The government

showed, through the testimony of corporate employees (some of

whom were appellant's kith and kin), that appellant, in his

management role, exercised substantial control over the day-to-

day operations of the corporation; that, on occasion, he filled

in for the dispatcher and assumed other "line" responsibilities;

and that, in late 1986, the corporation altered its recordkeeping

practices in two significant respects, the net effect of which

was to make detection of the forthcoming fraud more difficult.

4The indictment was later superseded. The final version of
the indictment contained some 435 counts.

4

Finally, the prosecution presented an expert witness who

identified appellant's handwriting in connection with ambulance

logbook entries, some of which involved the Medicare recipients

at issue.

As the prosecution had anticipated, appellant offered

little contradiction to charges that the corporation made

fraudulent representations in seeking Medicare payments and that

it unlawfully converted federal funds. Instead, appellant

pitched his defense on a relatively narrow ground, denying that

he, himself, knew of, or could be held criminally accountable

for, the corporation's peccadilloes.

At the close of the evidence, appellant moved for

judgment of acquittal, Fed. R. Crim. P. 29, principally on this

ground. The district court rejected the motion. The jury

convicted appellant on four hundred twenty counts (the other

fifteen counts in the superseding indictment having been dropped

before trial). This proceeding followed.

II. THE MERITS

This is a rifle-shot appeal. Appellant advances only a

single assignment of error, claiming insufficiency of the

evidence. In reality, he aims his fire at an even smaller

target, for he effectively concedes that the government proved

the commission of the crimes. Refined to bare essence, then, his

appeal stands or falls on the simple proposition that the

government failed to prove his complicity in the scheme. We

consider his plaint.

5

A. Standard of Review.

The well-settled standard applicable to sufficiency-of-

the-evidence challenges requires that this court determine

whether, after assaying all the evidence in the light most

amiable to the government, and taking all reasonable inferences

in its favor, a rational factfinder could find, beyond a

reasonable doubt, that the prosecution successfully proved the

essential elements of the crime. See Ortiz, 966 F.2d at 711;

Maraj, 947 F.2d at 522. In this process, a reviewing court must

defer all credibility judgments to the jury. See United States

v. David, 940 F.2d 722, 730 (1st Cir. 1991), cert. denied, 112 S.

Ct. 2301 (1992); United States v. Echeverri, 982 F.2d 675, 677

(1st Cir. 1993); United States v. Serrano, 870 F.2d 1, 5 (1st

Cir. 1989).

Contrary to appellant's insinuation, the criminal law

does not place a special premium on direct evidence. As a

general matter, the prosecution's burden of proof can be

satisfied by either direct or circumstantial evidence, or by any

combination thereof. See Echeverri, 982 F.2d at 677; United

States v. Victoria-Peguero, 920 F.2d 77, 86-87 (1st Cir.), cert.

denied, 111 S. Ct. 2053 (1991). As long as the evidence taken in

its entirety supports a judgment of conviction, it need not rule

out every other reasonable hypothesis of innocence. See

Victoria-Peguero, 920 F.2d at 86-87.

B. Discussion.

Appellant submits that the prosecution introduced no

6

direct evidence that he, himself, committed fraud, aided or

abetted another's fraud, or induced some third person to commit

fraud. We agree: the government produced nothing in the way of

a confession or any other single piece of evidence that, standing

alone, might irrefutably prove appellant's guilty knowledge. But

a court will not automatically invalidate a conviction merely

because the jury based its finding of scienter, and, hence, its

verdict, on circumstantial evidence alone. Guilty knowledge,

like specific intent, see, e.g., United States v. Desmarais, 938

F.2d 347, 352 (1st Cir. 1991); United States v. Campa, 679 F.2d

1006, 1010 (1st Cir. 1982), seldom can be established by direct

evidence. This principle has particular pertinence in respect to

fraud crimes which, by their very nature, often yield little in

the way of direct proof. Unless an accomplice turns, a miscreant

confesses, or a suspect is snared by his own rodomontade,

prosecutions for fraud must routinely be mounted on the basis of

indirect evidence.

This approach to proving guilty knowledge is neither

legally problematic nor even controversial. The law is long

since settled that the prosecution may prove its case without

direct evidence of a defendant's guilty knowledge so long as the

array of circumstantial evidence possesses sufficient persuasive

power. See Maraj, 947 F.2d at 523; United States v. Boylan, 898

F.2d 230, 242 (1st Cir.), cert. denied, 498 U.S. 849 (1990);

United States v. Mount, 896 F.2d 612, 615 (1st Cir. 1990); United

States v. Thornley, 707 F.2d 622, 625 (1st Cir. 1983). Moreover,

7

"[c]ircumstantial evidence tending to show guilty knowledge need

not compel a finding of such knowledge in order to sustain a

conviction; all that is necessary is that reasonable jurors could

be convinced beyond a reasonable doubt that the defendants had

guilty knowledge." United States v. Flaherty, 668 F.2d 566, 579

(1st Cir. 1981); accord United States v. Kilcullen, 546 F.2d 435,

443 (1st Cir. 1976) (collecting cases), cert. denied, 430 U.S.

906 (1977). In this case, then, the pivotal issue is not whether

there is direct evidence of appellant's guilty knowledge.

Rather, the proper query hinges on whether a rational factfinder

reasonably could infer appellant's guilty knowledge and, hence,

his participation in the charged crimes, from the whole of the

evidence, bearing in mind the presumption of innocence and the

government's burden to prove essential facts beyond a reasonable

doubt. We believe this query merits an affirmative answer.

Here, the government proved the appellant held the

reins of corporate control and had hands-on involvement in the

operation of the business. There was testimony, for example,

that appellant, himself, spent long hours at the corporate

headquarters, ran the company, conducted management and staff

meetings, reviewed run logs and weekly schedules of driver

assignments and equipment utilization, sometimes assumed the role

of dispatcher, and enjoyed sole dominion over the corporation's

cash flow. Many of the transportation services described in the

fraudulent billings required special hours for drivers, which a

jury reasonably could infer affected payroll and appellant's

8

domain unquestionably included payroll.

There was more. Appellant's name invariably appeared

on Medicare claim forms. He was intimately familiar with the

method and manner in which the corporate records were kept, and

those records were maintained under his ultimate control. The

jury had before it the handwriting evidence, chronicling

appellant's authorship of some fraudulent logbook entries, and

the evidence of abrupt changes in recordkeeping practices,

conducive to covering up the scheme. Finally, the corporation

was in dire financial straits, a fact which made more likely the

owner's involvement in the illegal enterprise through which the

corporation remained afloat. See United States v. McMahon, 938

F.2d 1501, 1507 (1st Cir. 1991).

Appellant invites us to consider each of these pieces

of evidence in isolation; and he claims that, taken one by one,

each piece can be explained away in some innocent fashion. We

decline the invitation. The evidence in a criminal case should

be viewed in its totality, see, e.g., United States v. Bourjaily,

483 U.S. 171, 179-80 (1987), for evidence particularly

circumstantial evidence often has an exponential effect. After

all, "[t]he sum of an evidentiary presentation may well be

greater than its constituent parts." Ortiz, 966 F.2d at 711. A

beehive near a country lane tells a stranger very little about

the use to which the property is devoted. Yet, if there are

eighty or ninety beehives in a shed, who would doubt that he had

stumbled upon an apiary?

9

Appellant also says that some witnesses contradicted

the inference hawked by the government, offering testimony that

tended to show appellant distanced himself from the day-to-day

operation of the ambulance service, confined his labors to sales

and payroll, delegated much responsibility, and attended the

workplace only sporadically. This argument lacks force, for it

asks us to usurp the jury's province. See Maraj, 947 F.2d at

523; David, 940 F.2d at 730. "[W]hen the jury is presented with

conflicting factual statements, the resolution of the conflict,

and any concomitant credibility calls, are uniquely within the

jury's province." Ortiz, 966 F.2d at 713; accord United States

v. Rothrock, 806 F.2d 318, 321 (1st Cir. 1986). Therefore, a

jury can freely choose to credit particular testimony while

discounting other testimony that arguably points in a different

direction. See United States v. Alvarez, 987 F.2d 77, 83 (1st

Cir.), cert. denied, 114 S. Ct. 147 (1993).

We note, too, that the element of guilty knowledge in a

criminal case may be supplied by inferences drawn from evidence

suggesting that a defendant deliberately blinded himself to what

would otherwise have been obvious. See, e.g., United States v.

Richardson, F.3d , (1st Cir. 1994) [No. 92-2307, slip

op. at 10-11]; United States v. St. Michael's Credit Union, 880

F.2d 579, 584-85 (1st Cir. 1989) (collecting cases); United

States v. Littlefield, 840 F.2d 143, 147 (1st Cir.), cert.

denied, 488 U.S. 860 (1988); United States v. Picciandra, 788

F.2d 39, 46 (1st Cir.), cert. denied, 479 U.S. 847 (1986). In

10

this case, the stage was appropriately set for such an inference:

although appellant claimed a lack of knowledge, the facts, taken

in the light most hospitable to the government, see Ortiz, 966

F.2d at 711, strongly suggested that, given the widespread nature

of the fraud and the importance to the corporation of the extra

revenues generated by it, only a conscious course of calculated

ignorance could have kept the company president from knowing the

truth. The trial court charged the jury on this principle, the

record supports the instruction, and appellant has not assigned

error to it. In itself, the resultant inference suffices to

validate the finding of guilty knowledge.

We will not paint the lily. Here, there was a

plenitude of evidence from which the jury rationally could have

inferred that appellant was a perpetrator of the crime, not an

innocent bystander. Indeed, when the extensive evidence showing

appellant's involvement in the corporation's day-to-day affairs

is coupled with the pervasiveness of the fraud and appellant's

powerful economic motive, it seems entirely reasonable to

conclude that appellant knew of, and participated in making,

false statements to procure Medicare funds to which the

corporation had no entitlement. This conclusion becomes

compelling when we recall that, in gauging witness credibility

and choosing from among competing inferences, jurors are entitled

to take full advantage of their collective experience and common

sense. See United States v. Vargas, 945 F.2d 426, 429 (1st Cir.

1991); United States v. Smith, 680 F.2d 255, 260 (1st Cir. 1982),

11

cert. denied, 459 U.S. 1110 (1983). There are limits to

coincidence.

III. CONCLUSION

We need go no further.5 In this instance, the

convergence of several lines of circumstantial evidence formed a

river of proof sufficient to warrant the jury's finding. See

Victoria-Peguero, 920 F.2d at 86-87. And because the evidence

need only support the verdict, rather than compel a conviction,

see Echeverri, 982 F.2d at 678; Boylan, 898 F.2d at 243,

appellant's assignment of error founders. In the last analysis,

courts ought not stubbornly insist that criminal juries disregard

the obvious. See United States v. Ingraham, 832 F.2d 229, 240

(1st Cir. 1987), cert. denied, 486 U.S. 1009 (1988).

Affirmed.

5Our determination that the evidence supports the verdict on
the "false statement" counts removes any need to consider the
specifics of the case in respect to the 130 counts charging
criminal conversion of public funds. As appellant owned the
corporation, the ill-gotten gains necessarily inured to his
benefit.

12